No. 13249

IN THE SUPREME COURT OF THE STATE OF MONTANA

1977

---

MONTANA DEPARTMENT OF REVENUE,
STATE OF MONTANA,

Petitioner and Appellant,

-vs-

THE AMERICAN SMELTING AND REFINING
COMPANY,

Defendant and Respondent.

---

Appeal from: District Court of the First Judicial District,
Honorable Peter Meloy, Judge presiding.

Counsel of Record:

For Appellant:

Terry B. Cosgrove argued, Helena, Montana
Theodore W. DeLooze argued, Salem, Oregon

For Respondent:

Hughes, Bennett and Cain, Helena, Montana
George T. Bennett argued, Helena, Montana
Charles Smith, Helena, Montana

For Amicus Curiae:

William D. Dexter appeared, Olympia, Washington

---

Submitted: January 27, 1977

Decided: JUL 11 1977

Filed: JUL 11 1977

Thomas J. Kearney
Clerk

Mr. Chief Justice Paul G. Hatfield delivered the Opinion of the Court.

This is an appeal by the Montana Department of Revenue (DOR) from a judgment entered in the district court, Lewis and Clark County, affirming a final decision of the State Tax Appeal Board (STAB). The STAB decision ordered a recomputation of the deficiency assessment levied by DOR against American Smelting and Refining Company (ASARCO).

In 1972 the auditors of the Multistate Tax Commission conducted an audit of ASARCO's records for the tax years 1967-1970. Subsequent to this audit, additional corporation license taxes were assessed against ASARCO by DOR. The amount of this deficiency assessment is the underlying issue upon appeal.

ASARCO is a New Jersey corporation engaged in national and international operations in the business of mining, smelting, refining, manufacturing, buying and selling nonferrous metals and minerals. ASARCO basically engages in two separate, but related areas of operation. The first is a primary metal operation consisting of the mining, milling, smelting and refining of nonferrous metals. The second is a nonferrous alloy operation consisting of the manufacture and sale of alloy products.

For the tax years in question ASARCO owned mines in Colorado, Washington, Arizona, New Mexico and Idaho in addition to mines in Canada and other foreign countries. It operated smelters and refineries in Texas, Maryland, Colorado, Montana, Missouri, Arizona, Nebraska, New Jersey, Washington and California for the years in question. Alloy manufacturing plants were located in Texas, New Jersey, California, Oklahoma and Indiana. ASARCO sales offices were located in New York, Baltimore, Boston, Cincinnati, Cleveland, Detroit, Milwaukee, Philadelphia, Rochester and St. Louis.

ASARCO owns and operates a smelter in East Helena which is its principal operation in Montana. This smelter receives lead ores and concentrates from company mines as well as unrelated suppliers. The smelted, but unrefined lead product is then shipped to other units of ASARCO for further treatment and eventual sale. Anaconda Company purchased various by-products

of the East Helena smelter for the years in question. In addition to the East Helena smelter ASARCO owns certain active and inactive mining properties in Montana.

Prior to 1962 ASARCO reported its income from its Montana properties by separate accounting, pursuant to section 84-1503, R.C.M. 1947. Under that method ASARCO determined the gross receipts from its Montana properties and deducted all expenses incurred by or attributable to such properties to arrive at Montana income. Where overhead expenses such as the cost of transportation were attributable to more than one state, they were apportioned to determine the Montana portion.

In 1962 ASARCO recognized that its business was unitary in nature and it could no longer use separate accounting for its income. Pursuant to section 84-1503 it requested permission from DOR to change from separate accounting to the unitary method of accounting. Permission was granted by DOR and a "hybrid" system of reporting income was instituted. Under this hybrid system, all but a negligible amount of total company income from rents, royalties, dividends, interest and sales of tangible and intangible properties was allocated to sources outside Montana. After deductions for the allocated income, ASARCO's operating net income was apportioned to Montana sources by the use of a three factor formula.

An in-depth examination of ASARCO's hybrid system indicates the following procedure was used to compute tax liability for the years in question. ASARCO classified the income listed below as nonbusiness income under DOR's 1967 regulations, deducted it from its apportionable income, and allocated it as indicated:

(a) Income from mine royalties paid by the lessees of ASARCO's Keystone Mine previously operated by ASARCO and located in the State of Colorado was allocated to the State of Colorado;

(b) Income from patents and copyrights on items developed by ASARCO's research department and used in ASARCO's operations and licensed to others, was allocated to commercial domicile;

- 3 -

(c) Income from rental of housing units on mining properties and rented to employes was allocated to the state where such rental units are located:

(d) Interest income from United States obligations, customers notes and bonds, notes on the sale of a plant and General Cable stock, from state and municipal bonds, time certificates, bankers acceptances, and commercial paper was allocated to the state of commercial domicile;

(e) Gains from the sales of tangible properties were allocated to the state of sale;

(f) Dividends paid on stocks were allocated to state of commercial domicile;

(g) Gains from the sale of stock were allocated to the state of commercial domicile; and

(h) Income from securities deposited with Montana state agencies and from money deposited in Montana was allocated to Montana.

The percentage of apportionable income or loss attributable to Montana sources was calculated by the use of this formula:

$$\frac{\dfrac{\text{Montana property}}{\text{Total ASARCO Property}} + \dfrac{\text{Montana Payroll}}{\text{Total ASARCO Payroll}} + \dfrac{\text{Montana Sales}}{\text{Total ASARCO Sales}}}{\text{Averaged by dividing by 3}} = \underline{\quad} \%$$

The percentage obtained was then multiplied by ASARCO's total apportionable income to determine the Montana contribution.

DOR contends the hybrid system used by ASARCO to calculate its Montana income incorrectly interpreted section 84-1503, R.C.M. 1947. That section at the time in question, stated:

> "If the income of any corporation from sources within the state cannot be properly segregated from income without the state, then, in that event, the amount of the net income returned shall be that proportion of the taxpayer's total net income which the taxpayer's gross business done in the state of Montana bears to the total gross business of the taxpayer, and apportionment shall be made under the rules and regulations prescribed by the state board of equalization, giving consideration to sales, property and payroll and such other factors as may be deemed applicable; provided, however, that the state board of equalization shall, upon the presentation of satisfactory

- 4 -

evidence, determine that the income from sources within the state of Montana may be properly segregated from income from sources without the state of Montana and shall allow separate accounting. The board shall publish not less than once a year, all rules and regulations pertaining to this section. All decisions by the board under this section shall be subject to judicial review in an action prosecuted by the corporation in the district court of Lewis and Clark county. The taxpayer cannot change from one method of accounting to another method of accounting without first obtaining permission from the board."

DOR interprets the above statute as creating only two methods of determining income from sources within Montana--separate accounting or apportionment of total net income. Separate accounting is available only if income from sources within the state may be segregated from sources without the state. In the absence of the above conditions, total business net income must be apportioned.

DOR determined that the income classified by ASARCO as nonbusiness income was, in fact, business income as defined by DOR's 1967 regulations. DOR therefore restored this income to apportionable net income. In addition, DOR included in apportionable net income the net income of six of ASARCO's wholly owned subsidiaries. DOR contends that ASARCO and the six subsidiary corporations were engaged in a unitary business and therefore the combination was merely an extension of the apportionment method of taxation dictated by section 84-1503.

Pursuant to DOR's calculations of ASARCO's Montana income additional corporate license taxes were assessed. Protest was made by ASARCO and a hearing was held before the director of DOR. The director's decision affirmed the deficiency assessment. Thereafter ASARCO appealed to STAB which reversed the director's decision. DOR then petitioned the district court, Lewis and Clark County, requesting a review of the STAB order. On December 17, 1975, the district court entered judgment affirming the decision of STAB. DOR appeals the district court judgment.

Three issues are before the Court upon appeal:

1) Whether DOR had the authority, pursuant to sections 84-1503 and 84-1508, R.C.M. 1947, to adopt its Regulations 1001-1020 (Chapter 10)

concerning rules for the apportionment of corporate net income?

2) Whether ASARCO was correct in its deduction of alleged non-business income from apportionable net income prior to apportionment?

3) Whether the income from six of ASARCO's wholly owned subsiaries was properly included in apportionable net income?

On December 30, 1966, DOR adopted its Regulations 1001-1020 (Chapter 10). These regulations were effective with respect to tax years beginning on and after January 1, 1967. Included within these regulations are specific rules for allocation and apportionment of corporate income derived from sources both within and without Montana. In addition key terms are specifically defined as to their application to the regulations.

The regulations provide for two methods of accounting for income; apportionment according to a three-factor formula and separate accounting. Separate accounting is allowed only in situations where income can be specifically segregated as to source.Apportionment of income must be used in all other cases. The apportionment system adopts what may be categorized as a "business vs. nonbusiness" test in regard to determining what income is apportioned and what income may be allocated to source. Under this system all business income is apportioned by use of the three-factor formula while only nonbusiness income may be allocated to source. Business income is defined as all income arising from transactions and activity in the regular course of the taxpayer's trade or business and includes income from tangible and intangible property if the acquisition, management and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations. Nonbusiness income is defined as all income other than business income.

ASARCO urges these regulations were ineffective as applied to it for the tax years 1967-1970 for two reasons:

1. DOR by virtue of section 84-1503 had the authority to adopt rules and regulations only as to the apportionment of such income as could not be segregated as to source.

2. The regulations adopt a "business vs. nonbusiness" income test

rather than the "source" of income test found in section 84-1503 and are therefore fatally inconsistent.

Any contention that DOR lacks the authority to adopt rules and regulations interpreting taxation statutes is without merit. In regard to the statute in question, the power to adopt rules and regulations is clearly and unambiguously stated within the text of the statute. Furthermore section 84-1508, R.C.M. 1947, gives DOR power to provide "such other regulations as may from time to time be found necessary." We affirmed this principle in State ex rel. Fulton v. District Court, 139 Mont. 573, 366 P.2d 435.

The crux of this entire case is the interpretation of section 84-1503 and DOR Regulations 1001-1020. There is no merit in ASARCO's contention that DOR has only authority to adopt rules and regulations for the apportionment of income incapable of segregation as to source.

The function of the Supreme Court when construing a statute is simply to ascertain and declare what is in substance stated therein, and not to insert what has been omitted or to omit what has been inserted. Dunphy v. Anaconda Co., 151 Mont. 76, 438 P.2d 660; In re Transportation of School Children, 117 Mont. 618, 161 P.2d 901; Section 93-401-15, R.C.M. 1947. The fundamental rule of statutory construction is that the intent of the legislature controls. Matter of Senate Bill No. 23, Chapter 491, Montana Session Laws of 1973, 168 Mont. 102, 540 P.2d 975, 32 St.Rep. 954; Hammill v. Young, 168 Mont. 81, 540 P.2d 971, 32 St.Rep. 935; Dunphy v. Anaconda Co., supra; Section 93-401-16, R.C.M. 1947. Where the intent of the legislature can be determined from the plain meaning of the words used, the courts may not go further and apply any other means of interpretation. State ex rel. Huffman v. District Court, 154 Mont. 201, 461 P.2d 847; Dunphy v. Anaconda Co., supra. Here, the plain meaning of the words used by the legislature unmistakably discloses its intent. DOR clearly has the authority to adopt rules and regulations as to the apportionment of corporate income without regard to source.

There also is no merit in ASARCO's second contention. ASARCO argues

- 7 -

that section 84-1503 contains a "source of income" test to be used in determining apportionable income vs. allocatable income. ASARCO concludes that this apparent conflict with the business vs. nonbusiness income test found in the regulations makes the regulations ineffective as applied to ASARCO. As support for its theory of inconsistency between the statute and the regulations, ASARCO points out that section 84-1503 was amended in 1974, and the amended statute conforms to the regulations.

In the construction of an amendatory act it will be presumed that the legislature, in passing it, intended to make some change in the existing law, and therefore the Court should endeavor to give effect to the amendment. Pilgeram v. Hass et al., 118 Mont. 431, 167 P.2d 339; Nichols v. School District No. 3, 87 Mont. 181, 287 P.624. However this presumption of change is not conclusive. This Court stated in School District No. 12 v. Pondera County, 89 Mont. 342, 297 P. 498, that a change in a statute may be made merely to express more clearly the original intent of the legislature. Such is the case here. The unamended statute is not a model of clear draftmanship in regard to guidelines for the apportionment of corporate income. DOR therefore adopted Regulations 1001-1020 to provide clear guidelines for taxpayer compliance. The legislature thereafter saw fit to clarify the section by the 1974 amendment to section 84-1503. The unamended version of section 84-1503 is not in conflict with the regulations and therefore ASARCO must report its income in compliance with those regulations.

Regarding ASARCO's second issue, we find the hybrid system of reporting income used by ASARCO to be invalid under section 84-1503. As above, the crux of this issue is the interpretation of section 84-1503 and Regulations 1001-1020. The intent of the legislature in regard to the determination of what income is apportionable income is clear and unambiguous. Section 84-1503 provides for two methods of accounting for income; separate accounting and apportionment.

Section 84-1503 provides a test for the determination of the correct

- 8 -

method of accounting to be used by a corporation in reporting its Montana corporation license tax. If income from all sources within Montana can "be properly segregated from income without the state" then and only then, may the separate accounting method be used. Furthermore if the separate accounting method is applicable, total net income must be allocated to source rather than the hybrid system used by ASARCO.

ASARCO recognized its business was unitary in nature in 1962. It requested and was granted permission by DOR to discontinue the separate accounting system then in use. Hence both parties agree that ASARCO must apportion its income and the question becomes what income is included in apportionable net income.

The regulations are clear and simple. All business income is apportionable and nonbusiness income is allocated to source. ASARCO argues that certain items of income listed above are nonbusiness income and therefore properly deductible from apportionable net income. This contention is incorrect.

The regulations state that business income includes income derived from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operation. After an in-depth examination of the income in question, we find this income is derived from sources that are integral portions of its business. This finding is in direct conflict with the district court's finding of fact which state this income is nonbusiness income. The test of whether this income is in reality business or nonbusiness income is a matter of statutory interpretation. We feel therefore that the finding of the district court is in error. We are confronted herein with a conclusion of law, rather than a finding of fact. Listed below are examples of the relationship of this alleged nonbusiness income to ASARCO.

1) Royalty Income--The royalty income arose from two sources, mine royalties and patent royalties. The mine royalties arose when ASARCO leased its Keystone mine in Colorado to an unrelated mining concern. ASARCO had operated this mine prior to the leasing. The royalty was computed on the

basis of mine production. The patent income arose from royalties paid for the use of devices developed by ASARCO's research department. These devices were developed initially for ASARCO's use in its various plants and mines. The main item included herein was a vertical feed furnace.

2) Rental Income. The majority of this income is derived from homesites rented to employees working near ASARCO mines and plants. Mr. Pecca, an ASARCO official, testified at the DOR hearing:

> "This is the, it's almost exclusively rents received from employees working at the company mines which are located in remote areas and the company is required to provide houses."

3) Interest Income--The interest income arose from customers' notes on bonds, U. S. government notes, notes taken on the sale of a plant and stock, state and municipal bonds, and time certificates and other commercial paper. All were clearly liquid securities and were therefore readily available for use in meeting company obligations and debts.

4) Gains on the Sale of Stock--ASARCO bought and sold stock in various corporations during the years in question. Included within the sales were stock of General Cable, Revere Copper, Kennicott Copper, and Hecla Mining Company. These corporations are all engaged in the business of either producing metal ore or manufacturing the refined product into goods. The stock was used by ASARCO for business purposes, such as gaining access to raw materials or access to potential customers for its refined metals. Therefore all the above income was generated by the unitary business operation of ASARCO.

The concept of including income from the sale of tangible and intangible property and income derived from rents, royalties and interest within apportionable net income is not new nor unique. In Sperry and Hutchinson Co. v. Department of Revenue, 270 Or. 329, 527 P.2d 729, 731, short term securities held to satisfy the need for liquid capital were held to be apportionable. The Oregon court stated:

> "S & H argues that because this income is the return on an intangible it must be allocated to legal situs. Nothing in our former law requires such an arbitrary

result and our current law expressly prohibits it."
527 P.2d 731.

The current law referred to by the Oregon court is in pertinent part identical to the DOR regulations here in question. A similar result dealing with short term intangibles was reached in Montgomery Ward & Co., Inc. v. Comm. of Taxation, 276 Minn. 479, 151 N.W.2d 294.

In Cleveland-Cliffs Iron Co. v. Michigan Corporation and Securities Commission, 351 Mich. 652, 88 N.W.2d 564, 572, the issue was whether an investment portfolio containing certain steel stocks should be included in determining the book net worth of the corporation. The court held the stocks were closely related to the company's business, quoting with approval from Flint v. Stone Tracy Company, 220 U.S. 107, 31 S.Ct. 342, 55 L.Ed. 389:

> "Nor can it be justly said that investments have no real relation to the business transacted by a corporation. The possession of large assets is a business advantage of great value; it may give credit which will result in more economical business methods; it may give a standing which shall facilitate purchases; it may enable the corporation to enlarge the field of its activities and in many ways give it business standing and prestige." 88 N.W.2d 572.

See also: Great Lakes Pipe Line Co. v. Commissioner of Taxation, 272 Minn. 403, 138 N.W.2d 612.

Concerning the final issue, DOR is correct in its contention that net income and apportionment factors of six of ASARCO's wholly owned subsidiaries must be included in ASARCO's computation of apportionable net income. This is merely an extension of the unitary method of taxation. Simply stated, the traditional concept of a combination of various units of a corporation for unitary method tax computation is extended to a combination of various related or affiliated corporations.

In the instant case, the six affiliated corporations are clearly separate and distinct from ASARCO. However all are wholly owned by ASARCO and share common members of their respective boards of directors with ASARCO. A close relationship exists between ASARCO's business operation and the subsidiaries in that the subsidiaries all provide ASARCO with material, services, or a market for its products. From the discussion of the individual

corporation's operations listed below, it is clear the corporations are dependent upon each other and each in turn contributes to the other's business success.

1) Federated Metals of Canada--Federated Metals is a Canadian corporation which basically operates the same business in Canada as ASARCO's American operation. ASARCO provides Federated with certain central services such as operations technology and accounting and financial services. In addition, sales between the two corporations are significant.

2) ASARCO Mercantile Company--ASARCO Mercantile is engaged solely in the purchase and sale of machinery for ASARCO's subsidiaries. All central services are provided by ASARCO.

3) Enthone, Inc.--Enthone is a Connecticut corporation engaged in the manufacture and sale of metal finishing chemicals and supplies used in metal plating. About 16% of Enthone's raw materials were purchased from ASARCO. Central services were provided by ASARCO.

4) International Metal Company--This company is ASARCO's exclusive sales outlet for materials delivered to foreign countries. ASARCO provides all central services.

5) Lone Star Lead Construction Co.--Lone Star is a Texas corporation engaged in lining tanks with lead for protection against corrosive contents. The vast majority of its lead requirements are purchased from ASARCO.

6) Northern Peru Mining Co.--All production from Northern Peru's mines are sold to ASARCO and refined in its plants.

In addition to the foregoing, Mr. Pecca testified as to other services provided by ASARCO to all its subsidiaries. These include:

1. ASARCO handles central insurance of the subsidiaries.

2. Services provided by ASARCO are billed to the subsidiaries, including top management.

3. All United States and state returns are prepared by ASARCO for the subsidiaries.

4. Legal services are provided by ASARCO for the subsidiaries

whenever necessary.

5.  Essential capital is provided for the subsidiaries, who do not go to outside sources without first going to ASARCO.

Coca Cola Company v. Department of Revenue, 271 Or. 517, 533 P.2d 788, 790, 792, is on all fours with the instant case. There the Oregon court said:

> "The principal issue in this case is whether the income from Coca Cola and its wholly owned subsidiaries may be combined and the apportionment formula applied to the sum to determine the income properly attributable to Oregon." 533 P.2d 790.

The Oregon court first stated that in order to properly combine the incomes of the parent and subsidiary, the business operation must be unitary. The unitary test was defined as whether the business units, or in this case corporations, are dependent upon each other and contribute to the operation of the other's business. Zale-Salem, Inc. v. Tax Com., 237 Or. 261, 391 P.2d 601. Unquestionably this test is met in the instant case. The Oregon court in Coca Cola Company then stated:

> "We must now decide whether the fact that Coca Cola and its wholly owned subsidiaries are organized as separate corporate entities precludes the Department of Revenue from combining their incomes to reflect the true character of their unitary business. We hold that it does not.
>
> " * * *
>
> "The question is fundamentally one of whether a business should stand in a better position for purposes of determining income merely because it chooses to use a multiple corporation organizational scheme. We do not feel that it should. We agree with the following statement of the California Supreme Court:
>
> "' * * * [A]ccepting, as we must, the application of the law to unincorporated wholly controlled branches or businesses located in other jurisdictions as set forth in Butler Brothers v. McColgan, 17 Cal.2d 664, 111 P.2d 334; Id., 315 U.S. 501, 62 S.Ct. 701, 86 L.Ed. 991, the conclusion is irresistible that the same rule should apply to incorporated wholly controlled branches or businesses so located. * * *' Edison California Stores v. McColgan, supra at 473-74, 183 P.2d at 17."

The decision of the district court is reversed. This case is remanded to the district court with instructions to enter judgment in favor of the

Montana Department of Revenue in the amount of the original deficiency
assessment.

_____
Chief Justice

We concur:

_____

_____

_____

_____
Justices

- 14 -