PMD INVESTMENT COMPANY (FORMERLY PAMIDA, INC.), A NEBRASKA CORPORATION, APPELLANT, v. STATE OF NEBRASKA, DEPARTMENT OF REVENUE, APPELLEE.

345 N.W.2d 815

Filed February 24, 1984. No. 82-844.

William H. Coates and Harvey B. Cooper of Abrahams, Kaslow & Cassman, for appellant.

Paul L. Douglas, Attorney General, and Ralph H. Gillan, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

BOSLAUGH, J.

This is an appeal in a proceeding to review an order of the Tax Commissioner which assessed a deficiency in the amount of $85,877 against the appellant, PMD Investment Company, for its franchise or income tax for the taxable years ending January 31, 1973, through January 31, 1976. The appellant was formerly known as Pamida, Inc., and will be referred to as Pamida.

The district court found that the order of the Tax Commissioner was supported by competent, material, and substantial evidence, and affirmed the order of the commissioner. Pamida has now appealed to this court.

Neb. Rev. Stat. §§ 77-27,127 and 77-27,128 (Reissue 1981) provide that the procedure for the judicial review of any final action of the Tax Commissioner, including the assessment of a proposed deficiency, is that provided in Neb. Rev. Stat. §§ 84-917 to 84-919 (Reissue 1981). The order may be reversed or modified only if it is (a) in violation of constitutional provisions; (b) in excess of the statutory authority or jurisdiction of the agency; (c) made upon unlawful

procedure; (d) affected by other error of law; (e) unsupported by competent, material, and substantial evidence; or (f) arbitrary or capricious. The review in this court is de novo on the record.

The principal controversy between the parties is whether Pamida is subject to being taxed by the combined income method on the theory that it operates a unitary business through its subsidiary corporations. Pamida contends that for tax purposes its income should be computed by a separate accounting method.

These accounting methods were discussed and defined in *Caterpillar Tractor Co. v. Lenckos*, 84 Ill. 2d 102, 115-16, 417 N.E.2d 1343, 1350-51 (1981), *appeal dismissed* ____ U.S. ____, 103 S. Ct. 3562, 77 L. Ed. 2d 1402 (1983), as follows: "There are two basic methods of accounting used by State tax officials to determine net taxable income in such a way as to avoid the constitutional problems which arise when a State attempts to tax that portion of a corporation's business income which clearly has been earned in other States or countries. The first method, called separate accounting, attempts to segregate and identify the sources or transactions which account for the generation of business income. . . .

"The other method of accounting, which the Director agreed should apply here, and which has been described, is the combined or unitary apportionment method of reporting. In order to apply this method to the tax returns of a corporate taxpayer, it must first be determined that it is a member of a unitary business group. As was briefly discussed, the term 'unitary business group,' when applied to a corporation which has subsidiaries or other associated corporations in other States or countries, is used to describe a group of functionally integrated corporate units which are so interrelated and interdependent that it becomes relatively impossible for one State to determine the net income generated by a particular corporation's activities within the State and there-

fore allocable to that State for purposes of taxation."

The purpose of the combined or unitary apportionment method of reporting is to permit a fair determination of the portion of business income that is attributable to business activity within the state by the reporting member of the unitary group.

The Illinois court defined a unitary business operation in these words: "A unitary business operation is one in which there is a high degree of interrelationship and interdependence between, typically, one corporation, which generally is a parent corporation, and its corporate subsidiaries or otherwise associated corporations, which group is usually engaged in multistate, and in some cases in international, business operations. Because of this integrated relationship, which is reflected in all phases of the business operations, it is extremely difficult, for purposes of taxation, to determine accurately the measure of taxable income generated within a State by an individual corporation of the unitary group which is conducting business in the State. Typically, the corporation's transactions and the income derived from them actually represent the business efforts of the individual corporation, plus efforts of other and possibly all members of the unitary business operation. As a result, the claimed income of each member of the group standing alone does not, in a real sense, reflect the conducting of a unitary business operation because the income is not attributable solely to the effort of the particular corporation." *Caterpillar Tractor Co. v. Lenckos, supra* at 108, 417 N.E.2d at 1347. See, also, *Kellogg Company v. Herrington, ante* p. 138, 343 N.W.2d 326 (1984).

The evidence before the commissioner consisted primarily of a stipulation of facts entered into by Pamida and the Department of Revenue. The stipulation shows that Pamida and its subsidiaries are primarily engaged in discount retailing and service merchandising or "rack jobbing."

Pamida and its subsidiaries are organized as a

three-tier corporate structure. In the first tier is Pamida, which is the parent corporation for all of the affiliated corporations and owns 100 percent of the stock of the second tier corporations. The second tier consists of three corporations, NuWay Drug Service of South Dakota, NuWay Drug Service, Inc. (an Iowa corporation), and NuWay Drug Service, Inc. (a Nebraska corporation), which operate the rack jobbing business and a corporation in each state where the discount retailing business is carried on. The third tier is comprised of corporations which own and operate the individual Gibson Discount stores and Quality Discount Centers. These third tier corporations are domestic corporations of the state in which the store is located. The stock of these corporations is owned by the second tier corporations.

The directors and officers of the subsidiaries of Pamida are also officers or employees of Pamida. Two men who serve as directors and officers of the subsidiaries are also directors as well as officers of Pamida.

All of the discount stores operate on a self-service, discount, primarily cash-and-carry basis, with the object of maximizing sales volume and inventory turnover with minimum overhead expenses. Pamida has a procedures manual which provides the procedures and policies for activities relating to the operation of local Gibson Discount Centers. Each discount center serves essentially a very small geographic district. The principal categories of merchandise sold in the Gibson Discount Centers are the following: health and beauty aids, soft goods (including apparel and footwear), automotive supplies, hardware and appliances, housewares, sporting goods, food and tobacco products, school and pet supplies, toys, jewelry, cameras, and film. Commencing with fiscal 1973, there were 145 general merchandise Gibson Discount Centers in operation in the states of Illinois, Iowa, Kansas, Minnesota,

Missouri, Nebraska, North Dakota, South Dakota, Wisconsin, and Wyoming.

Pamida employs district managers who are assigned by geographic region. They have primary responsibility for preparing new stores for opening, including furnishing such stores with fixtures and initial inventories of goods, and hiring the initial store staff. With respect to existing stores the district managers have responsibility for locating and correcting trouble areas and for the handling of major personnel problems. The district managers also evaluate the managers and make recommendations to Pamida regarding transfers, promotions, and termination of managers. In fiscal 1973 there were 11 district managers; in 1974, 16; in 1975, 17; and in 1976, 17.

Pamida hires assistant managers, places them for on-the-job training at Gibson Discount Centers, and carries them on its payroll during this limited training period. It determines the promotion of assistant managers and, with the concurrence of the affected manager, transfers managers from one store to another. It sets the salary and bonuses for the managers for the Gibson Discount Centers and Quality Discount Centers.

The managers of the Gibson Discount Centers are given discretion in several areas. They hire and fire their subordinates, except for assistant managers or manager trainees. They set the wage levels for these same employees. They can purchase merchandise from local vendors. These items include cigarettes, magazines, candy, and other similar items. They can place local advertising. They can write checks for small purchases. Except in the case of store managers and assistant store managers, transfer of personnel between discount centers is nonexistent.

Thirty-five to forty percent of the merchandise sold by Gibson Discount Centers comes through the Pamida warehouse. Another 35 to 40 percent is pur-

chased from outside suppliers on the basis of contracts negotiated by Pamida. The remainder is purchased by the manager of the Gibson Discount Center from local vendors. Pamida determines what type of merchandise may be carried by the Gibson Discount Centers after taking into account recommendations of the store managers, particularly with respect to regional needs and demands.

Initial financing of the inventory for a new Gibson Discount Center is through credit provided by Pamida and outside suppliers. Other financing may be arranged by Pamida through the local store's local banks. Operating capital is obtained by Pamida through loans under which Pamida and its subsidiaries are severally and jointly liable. Insurance for the retail stores is obtained by Pamida, but each local store is separately billed. The leasing of store facilities not owned by Pamida is arranged by Pamida; however, the lease payments are the liability of the local store.

Pamida performs a number of administrative services for the Gibson Discount Centers. It maintains the books and records for the local stores. It pays all invoices for merchandise from outside suppliers, writing checks on the stores' local checking accounts. It prepares the payroll for Gibson Discount Centers, although time records are kept by the local stores and the rates of pay are set by the local managers. It prepares and files all the tax returns for the retail stores. For these services Pamida charges the local stores 2.4 percent of their soft goods sales and 2 percent of all other sales.

Pamida provides group insurance, profit sharing, and stock option plans for employees of the Gibson Discount Centers. Payrolls are handled by Pamida. The complaint procedures for Gibson employees include an appeal to the personnel director and district manager of Pamida. Pictures of all managers, assistant managers, group managers, and department supervisors are required to be on file with

Pamida. Personnel procedures and policies are provided in the Pamida procedures manual.

Virtually all income and approximately 95 percent of all expenses are attributed to individual store locations through the use of a cost accounting system. Expenses relating to the acquisition and the transportation of goods for sale are allocated by a markup, so that each store incurs an expense of approximately 8 percent over and above the actual cost of acquiring the goods. Administrative expenses are allocated by a management fee charge of 2 to 2.4 percent of sales.

NuWay Drug Service, Inc., an Iowa corporation, is a wholly owned subsidiary of Pamida. It sells health and beauty aids, housewares, soft goods, and miscellaneous supplies through a rack jobbing operation, and sells merchandise to Gibson Discount Centers, NuWay Drug Service of South Dakota, and NuWay Drug Service, Inc., of Nebraska, and to nonaffiliated companies.

NuWay Drug Service, Inc., a Nebraska corporation, is a wholly owned subsidiary of Pamida. During 1972, 1973, 1974, and 1975, its business consisted almost exclusively of selling merchandise to Pamida and its subsidiaries. It has several wholly owned subsidiaries which operated small discount retail stores which were operated like the Gibson Discount Centers.

The service merchandising or rack jobbing business operated from warehouses in Omaha and South Sioux City, Nebraska, by the NuWay Drug Service corporations of Iowa, Nebraska, and South Dakota, did, at various times during the years in question, distribute about 8,500 nonfood items to approximately 1,400 nonaffiliated retailers located in nine midwestern states.

The evidence which has been summarized, and which was taken from the stipulation of the parties, supports a finding that Pamida and its subsidiaries conduct a unitary business and that the proper meth-

od of determining the income derived from sources in Nebraska was the combined income approach. *Coca Cola Co. v. Dept. of Rev.*, 271 Or. 517, 533 P.2d 788 (1975); *Mont. Dept. of Revenue v. ASARCO*, 173 Mont. 316, 567 P.2d 901 (1977), *appeal dismissed* 434 U.S. 1042, 98 S. Ct. 884, 54 L. Ed. 2d 793 (1978).

Pamida complains that rules Reg-24-16 and Reg-24-17 of the Nebraska Corporation Income Tax Regulations, which became effective January 26, 1974, could not be applied to income from prior years. The district court correctly determined that Nebraska's version of the Uniform Division of Income for Tax Purposes Act, Neb. Rev. Stat. §§ 77-2735 to 77-2752 (Reissue 1981), the Multistate Tax Compact, Neb. Rev. Stat. § 77-2901 (Reissue 1981), and other statutory provisions authorize the use of the combined income approach. See *Kellogg Company v. Herrington*, *ante* p. 138, 343 N.W.2d 326 (1984).

As the Illinois court stated in *Caterpillar Tractor Co. v. Lenckos*, 84 Ill. 2d 102, 117-20, 417 N.E.2d 1343, 1351-53 (1981): "The first major attempt in promoting uniformity among the States with respect to taxing interstate business was the drafting and adoption of the Uniform Division of Income for Tax Purposes Act (UDITPA). UDITPA was incorporated into article IV of the Multistate Tax Compact (MTC) (Ill. Rev. Stat. 1973, ch. 120, par. 871 *et seq.*) and as stated in the Official Commentary cited above, the MTC became effective in Illinois on July 1, 1967. The questions before us now are: (1) whether UDITPA authorizes the use of the unitary method of apportionment; and (2) if it does, whether this method has been incorporated into the Illinois Income Tax Act.

"Considering whether UDITPA authorizes the use of unitary apportionment, we first observe that UDITPA does not make any reference to unitary apportionment or combined reporting. The absence of specific reference to the unitary method is not, how-

ever, critical, for in a number of jurisdictions that adopted UDITPA and in some of them, the MTC as well, courts have held that unitary apportionment or combined reporting was authorized though the particular income tax statute made no reference to this method of reporting. In *Coca Cola Co. v. Department of Revenue* (1975), 271 Or. 517, 533 P.2d 788, the Oregon Department of Revenue applied a unitary or combined apportionment method of accounting to the income tax returns of the plaintiff corporation and its wholly owned subsidiaries, which had filed separate returns using Oregon's three-factor apportionment formula, which is similar to that set out in the Illinois statute. The Department argued that the combined method, though not specifically provided for in the tax statutes into which UDITPA had been incorporated, would more accurately reflect the income of what it contended was a unitary business operation. Concluding that the company's syrup and bottling operations were so inextricably connected as to constitute a unitary business, the court stated: 'The combined method of apportionment reporting is wholly consistent with, and a natural extension of, the apportionment method.' (271 Or. 517, 528, 533 P.2d 788, 793.) The court held that the plaintiff and its subsidiaries 'are all part of the same unitary operation and were required to use the combined method of reporting for the tax years in question.' 271 Or. 517, 529, 533 P.2d 788, 794. See also *American Smelting & Refining Co. v. Idaho State Tax Com.* (1979), 99 Idaho 924, 592 P.2d 39; *Montana Department of Revenue v. American Smelting & Refining Co.* (1977), 173 Mont. 316, 567 P.2d 901.

"The Supreme Court has also held that the absence of any statutory reference to the unitary method of reporting does not forbid its use. In *Butler Brothers v. McColgan* (1942), 315 U.S. 501, 86 L. Ed. 991, 62 S. Ct. 701, the plaintiff, an Illinois corporation conducting a wholesale goods and general merchandise business, was licensed to conduct

business in California. The company had wholesale distributing divisions located in seven states, including California, each serving a district area and each controlling its own sales force, accounting procedures, sales operations and credit and financing procedures as well. Though the California tax statute did not specifically authorize the combined method of reporting or make any references to unitary operations, the court upheld the State's decision to apply the unitary method to the combined income derived from the operations of the seven divisions. In its holding the court stated that 'this Court has recognized that unity of the use and management of a business which is scattered through several states may be considered when a State attempts to impose a tax on an apportionment basis. As stated in *Hans Rees' Sons, Inc. v. North Carolina*, [(1931), 283 U.S. 123, 133, 75 L. Ed. 879, 905, 51 S. Ct. 385, 389], "the enterprise of a corporation which manufactures and sells its manufactured product is ordinarily a unitary business, and all the factors in that enterprise are essential to the realization of profits." ' 315 U.S. 501, 508, 86 L. Ed. 991, 996, 62 S. Ct. 701, 704-05.

"In a later case, *Northwestern States Portland Cement Co. v. Minnesota* (1959), 358 U.S. 450, 3 L. Ed. 2d 421, 79 S. Ct. 357, the court addressed a similar challenge to the use of a unitary apportionment method, and in citing *Hans Rees'* and other apportionment decisions (*e.g., Bass, Ratcliff & Gretton, Ltd. v. State Tax Com.* (1924), 266 U.S. 271, 69 L. Ed. 282, 45 S. Ct. 82; *Underwood Typewriter Co. v. Chamberlain* (1920), 254 U.S. 113, 65 L. Ed. 165, 41 S. Ct. 45) the court upheld the use declaring: 'These cases stand for the doctrine that the entire net income of a corporation, generated by interstate as well as intrastate activities, may be fairly apportioned among the States for tax purposes by formulas utilizing in-state aspects of interstate affairs.' 358 U.S. 450, 460, 3 L. Ed. 2d 421, 428, 79 S. Ct. 357, 363. See also *Exxon Corp. v. Wisconsin Department*

*of Revenue* (1980), 447 U.S. 207, 65 L. Ed. 2d 66, 100 S. Ct. 2109; *Mobil Oil Corp. v. Commissioner of Taxes* (1980), 445 U.S. 425, 63 L. Ed. 2d 510, 100 S. Ct. 1223.''

The fact that Pamida uses a method of separate accounting is not binding upon the State. In *Exxon Corp. v. Wisconsin Dept. of Revenue*, 447 U.S. 207, 100 S. Ct. 2109, 65 L. Ed. 2d 66 (1980), the U.S. Supreme Court held that the use of a separate functional accounting system by Exxon did not prevent Wisconsin from using the combined or unitary apportionment method to determine the income of Exxon which was subject to tax in Wisconsin. The Court said at 221-23: ''As this Court has on several occasions recognized, a company's internal accounting techniques are not binding on a State for tax purposes. For example, in *Butler Bros.* v. *McColgan, supra*, an interstate business challenged the application of the California apportionment statute. The company was engaged in the wholesale dry goods and general merchandise business as a middleman, and it had distributing houses in seven States, including one in California. Each house maintained stocks of goods, had a cognizable territory, had its own sales force, did its own solicitation of sales, made its own credit and collection arrangements, and kept its own books. There was, however, a central buying division that was able to purchase goods for resale at a lower price. The company used 'recognized accounting principles,' 315 U.S., at 505, to allocate all costs and charges to each house, with certain centralized expenses allocated among the houses. Based on that 'separate accounting system,' *id.*, at 507, the business asserted there was no net income in California.

''We concluded that California could constitutionally apply its apportionment formula to the company's total net income to establish taxable income, rather than being limited to the income shown by the

taxpayer's accounting methods to be attributable to the one house in that State. . . .

"Similarly, in *Mobil Oil Corp.* v. *Commissioner of Taxes*, we noted that 'separate accounting, while it purports to isolate portions of income received in various States, may fail to account for contributions to income resulting from functional integration, centralization of management, and economies of scale.' 445 U.S., at 438. Since such factors arise 'from the operation of the business as a whole, it becomes misleading to characterize the income of the business as having a single identifiable "source." Although separate geographical accounting may be useful for internal auditing, for purposes of state taxation it is not constitutionally required.' "

We conclude that the order of the commissioner was supported by competent, material, and substantial evidence; it was not in violation of constitutional provisions nor in excess of the statutory authority or jurisdiction of the agency; and it was not arbitrary nor capricious. The judgment of the district court must be affirmed.

AFFIRMED.