PENTZIEN, INC., A NEBRASKA CORPORATION, APPELLANT, V. STATE OF NEBRASKA, DEPARTMENT OF REVENUE, APPELLEE.
418 N.W.2d 546

Filed January 22, 1988.    No. 86-048.

Daniel J. Duffy and Kurt F. Tjaden of Cassem, Tierney, Adams, Gotch & Douglas, for appellant.

Robert M. Spire, Attorney General, and L. Jay Bartel, for appellee.

BOSLAUGH, C.J., Pro Tem., WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ., and COLWELL, D.J., Retired.

HASTINGS, J.

This is an appeal in a proceeding to review an order of the Tax Commissioner which assessed deficiencies against the appellant, Pentzien, Inc., for its franchise or income tax for the taxable years ending March 31, 1973 through 1975, and 1978 through 1980. The decision was affirmed by the State Board of Equalization and Assessment (Board). The district court for Lancaster County in turn affirmed the decision of the Board, finding that it was not (1) in violation of constitutional provisions, (2) in excess of the statutory authority or jurisdiction of the agency, (3) made upon unlawful procedure, (4) unsupported by competent, material, and substantial evidence, or (5) arbitrary or capricious.

On appeal to this court, appellant assigns as error the above specific findings of the district court, as well as claiming generally that the court erred in affirming the decision of the Board. Appellant neither specifies nor argues the constitutional issue. In the final analysis, the sole issue to be determined is whether the appellant operates a unitary business which requires, for tax purposes, the apportionment of its total income as having been derived from sources within Nebraska, as provided by statute, or whether the portion of its taxable income derived from sources within Nebraska is separate and distinct from that portion derived from sources outside the state.

The Board is a state agency within the meaning of Neb. Rev. Stat. § 84-901 (Reissue 1981), so as to be subject to the Administrative Procedures Act, Neb. Rev. Stat. §§ 84-901 et seq. (Reissue 1981). *County of Gage v. State Board of Equalization & Assessment*, 185 Neb. 749, 178 N.W.2d 759 (1970). Accordingly, although its decision is reviewable by the district court for error on the bases set forth above, § 84-917, this court's review of an agency's decision is de novo on the record. *In re Complaint of Federal Land Bank of Omaha*, 223 Neb. 897, 395 N.W.2d 488 (1986).

Pentzien, Inc., is a Nebraska corporation, with its executive office located in Omaha. It specializes in the pipeline construction business, with 90 percent of its work involving installation of pipelines across bodies of water in several states. Additionally, Pentzien contracts for dredging jobs and maintains a horse farm located on the western edge of Omaha.

An equipment storage and repair facility is also located in Omaha, separate and apart from the corporate office. Because the corporation undertakes construction jobs in various states, Pentzien leases property for a second storage and repair facility in Little Rock, Arkansas. During the summer construction season, the Omaha facility has 8 to 10 permanent employees, while the Little Rock facility has 5. During the winter months, this number may be increased to 20 or 25 per facility.

The Omaha office permanently employs eight people, while the horse farm employs six or seven. The eight members at the Omaha office include the president, the vice president, the secretary-treasurer, an engineer, an accountant, and three secretaries. The vice president and the engineer are based in Omaha but periodically travel from job to job to review progress.

At each jobsite, Pentzien has 25 regular employees, consisting of supervisors, 2 field office people, engineers, truckdrivers, equipment operators, and mechanics. The remainder are union employees hired from job to job. These union employees include locally available laborers and migrant welders. Each jobsite maintains a field office, with a field office manager. Onsite, the supervisor runs the job. Several times a day, the supervisor has telephone conversations with the

president, who tells the supervisor what is to be done.

Bids are prepared by the vice president and the engineer at the Omaha office. The president is very active in participating in the bidding process, promoting work, and reviewing all jobs.

Although time records are kept onsite, the Omaha office prepares the payroll for each job—computing deductions and printing the checks. Books and payroll are also kept for the farm at the Omaha office. The greatest number of payroll employees is estimated at 200 to 225. A hospital-medical insurance plan for employees of the pipeline company and the farm is available through the home office on a cost-share basis.

A small checking account is maintained at each jobsite for incidentals, but major bills incurred on the job are forwarded to Omaha for payment. The general bank accounts for all expenses of the corporation are maintained by the Omaha office, either in Omaha or in Council Bluffs. An accounting system is maintained at the home office by the secretary-treasurer. Each job is assigned a number; and separate ledgers are kept to show income received for each given job. This system also allocates expenses at year's end, for present salaries, Omaha office salaries, and repair yards, to each individual job.

Finally, the Omaha office prepares tax returns for the corporation, with the exception of income tax returns, which are prepared by an accounting firm.

In 1968, plaintiff had petitioned the State Tax Commissioner to use separate accounting in accord with Reg-24-14 of the Nebraska Corporate Income Tax Regulations. Floyd Kent Kalb, chief of the income tax division, in a letter dated June 14, 1968, responded that the petition to separately account was not necessary if the Nebraska portion of a corporation's income is separate and distinct from the portion derived from sources outside of Nebraska. Pentzien has used the separate accounting system for over 30 years.

For the tax years ending March 31, 1973 through 1975, and 1978 through 1980, Pentzien reported Nebraska corporate income on a separate accounting basis. The Nebraska Department of Revenue issued deficiency assessments for these years. The findings and order of the State Tax Commissioner

sustained the assessments. The Board affirmed the order. The Board's ·decision was then upheld by the district court for Lancaster County.

It should be noted that Pentzien filed returns on an apportionment basis in Missouri, Kansas, and Mississippi. In Kansas, however, there appears to be no provision for any kind of accounting other than apportionment.

As appellant asserts, the wording of former Neb. Rev. Stat. § 77-2743 (Reissue 1981) (repealed in 1984) is clear and unambiguous. The statute provides:

> All business income shall be apportioned to this state as follows:
>
> (1) If the portion of taxable income derived from sources within Nebraska is separate and distinct from the portion derived from sources without Nebraska, it shall be separately determined and reported without the use of the apportionment factors provided in sections 77-2744 to 77-2752; or
>
> (2) If the portion of taxable income derived from sources within Nebraska cannot be readily separated from the portion derived from sources without Nebraska, it shall be determined by multiplying the taxpayer's entire taxable income by a fraction, the numerator of which is the property factor plus the payroll factor plus the sales factor, and the denominator of which is three.

The statute, however, must be read in connection with Reg-24-15 of the Nebraska Corporate Income Tax Regulations to ascertain its meaning. The regulation provides:

> If a taxpayer is engaged in a multistate business and the income derived from within Nebraska is separate and distinct from the income derived without Nebraska pursuant to the requirements stated below, the taxpayer shall separately account taxable income to Nebraska.
>
> Before a taxpayer engaged in a multistate business may separately account taxable income to Nebraska, the following requirements shall be satisfied:
>
> (1) The books and records are kept by recognized accounting standards to accurately reflect the amount of income of the multistate business which was realized in

Nebraska during the taxable period,

(2) The management functions of the business operations within Nebraska are separate and distinct so that in conducting the Nebraska business operations the management within Nebraska did not utilize or incur centralized management services consisting of operation supervision, advertising, accounting, insurance, financing, personnel, physical facilities, technical and research, sales and servicing, or purchasing during the taxable period,

(3) The business operations are separate and distinct and do not contribute to the overall operations of the company, and there are no interstate, intercompany, or interdivisional purchases, sales, or transfers during the taxable period.

If the taxpayer does not satisfy all three requirements stated above, then the taxpayer shall determine Nebraska taxable income by use of the apportionment formula.

As the Board has indicated, whether the appellant qualifies under (1) of the statute is not a question of strict statutory interpretation but, rather, involves an indepth analysis of the factual circumstances of appellant's activities. Such was the conclusion of the Supreme Court of Alaska with regard to a statute resembling § 77-2743. *State, Dept. of Revenue v. Amoco Prod. Co.*, 676 P.2d 595 (Alaska 1984).

In essence, appellant argues that separate accounting should be given preference over the apportionment method. Separate accounting is *not* given preference under the Nebraska statutes. Reg-24-15 clearly states that separate accounting may be used if, and only if, all three prongs of its test are satisfied.

Nebraska's method of determination is wholly consistent with the actions of the U.S. Supreme Court in this area. In *Container Corp. v. Franchise Tax Bd.*, 463 U.S. 159, 103 S. Ct. 2933, 77 L. Ed. 2d 545 (1983), the Court found that a substantial flow of value had passed from a parent company to its foreign subsidiaries so as to render the company a unitary, integrated business. The value consisted of both monetary and technical assistance. Several key factors were that the parent company assisted in providing both new and used equipment,

loaned funds and guaranteed loans provided by others, supervised, and filled the personnel needs of its subsidiaries that could not be met locally. The task of overseeing the operations of the subsidiaries was placed in the hands of one senior vice president and four other officers. These officers' duties included establishing general standards of professionalism, profitability, and ethical practices, as well as dealing with major problems and long-term decisions. Local executives, however, handled day-to-day management of the subsidiaries. The Court held: "We need not decide whether any one of these factors would be sufficient as a constitutional matter to prove the existence of a unitary business. Taken in combination, at least, they clearly demonstrate that the state court reached a conclusion 'within the realm of permissible judgment.' " 463 U.S. at 179-80.

In *Mobil Oil Corp. v. Commissioner of Taxes*, 445 U.S. 425, 100 S. Ct. 1223, 63 L. Ed. 2d 510 (1980), the plaintiff both partially and wholly owned foreign corporations that were independently operated and managed. Vermont was allowed to include plaintiff's "foreign source" dividend income from corporations operating abroad. Because plaintiff had failed to show that each corporation was a distinct or discrete business enterprise, the Court agreed that the income from foreign sources had a requisite nexus with instate activities.

Similarly, in *Exxon Corp. v. Wisconsin Dept. of Revenue*, 447 U.S. 207, 100 S. Ct. 2109, 65 L. Ed. 2d 66 (1980), the plaintiff was found to be a vertically integrated petroleum company doing business in several states. The U.S. Supreme Court stated that "[w]hile Exxon may treat its operational departments as independent profit centers, it is nonetheless true that this case involves a highly integrated business which benefits from an umbrella of centralized management and controlled interaction." 447 U.S. at 224. Exxon maintained a "centralized purchasing office in Houston whose obvious purpose was to increase overall corporate profits through bulk purchases and efficient allocation of supplies among retailers." *Id.*

The important links among the construction sites, showing centralized management and control, were stated most clearly

in the testimony of Harold Elsasser, secretary-treasurer of Pentzien:

> We have two engineers actually, our Vice President is also an engineer. They base in Omaha and they travel to the jobs periodically to review the progress. They also look at the jobs we're going to bid and they inspect them and then come back to the Omaha office to prepare the bids.
>
> . . . .
>
> . . . He [the president] participates in the bidding, promotes work, he reviews all the jobs, he's a very active individual.
>
> . . . .
>
> . . . The President tells him [the job superintendent] what to do.

In the instant case, appellant charged one president with the task of overseeing the entire operation. A team of coworkers in Omaha controls the overall strategy of the enterprise. The operational expertise of a vice president and an engineer is utilized to prepare bids for contracts, the lifeblood of the corporation.

The above analysis, as applied to Pentzien, leads to the conclusion that the individual construction projects do not, in effect, operate independently. On the contrary, they are functionally integrated due to centralized accounting and a considerable interplay between the home office and the construction sites. The central office plays a substantial role in facilitating contract bidding and providing financial services and health care options. Major expenses incurred by individual sites are transferred to Omaha for approval and payment. The obvious purpose behind this scheme is for the Omaha office to retain control over its parts.

The job foreman or supervisor runs the job and calculates time records for payroll purposes. The case of *Container Corp. v. Franchise Tax Bd.*, 463 U.S. 159, 103 S. Ct. 2933, 77 L. Ed. 2d 545 (1983), held that although day-to-day management responsibilities may lie in the hands of local executives, this alone is insufficient to defeat a unitary business finding.

Appellant argues that because there is no exchange of value in its corporation that is "not capable of precise identification

or measurement," its direct accounting method is justified. Brief for Appellant at 15. It states that rent income from its Omaha office building is separate and distinct from its horse farm operation income, which is separate and distinct from income received on construction jobs. Yet, certainly, the individual jobsites reap the benefits of Omaha's accounting and supervisory roles, as well as the central storage and repair facility located there. The sites enjoy a reduced overhead due to the Omaha hub office's handling of all administrative matters. They do not have the capacity to operate independently of the home office. They depend on the office for actual services, including payroll, preparation of tax returns, and hiring of accountants to perform such services.

*PMD Investment Co. v. State*, 216 Neb. 553, 345 N.W.2d 815 (1984), is of particular significance in deciding this case. There, the plaintiff, PMD, formerly Pamida, Inc., was a parent corporation of individual Gibson Discount Centers. Pamida and its subsidiaries were found to conduct a unitary business such that the proper method of determining its income from sources in Nebraska was the combined income, or apportionment, approach. An order of the Tax Commissioner assessing a deficiency tax was affirmed.

Like Pentzien's home office, Pamida was found to perform a number of administrative services for its Gibson Discount Centers. Pamida maintained the books and records for the local stores. It prepared the payroll, although time records were kept by the local stores. Pamida also provided group insurance for all employees. Furthermore, virtually all income and approximately 95 percent of all expenses were attributed to individual store locations, yet this court found the evidence sufficient to sustain a unitary business finding. The above facts are absolutely identical in form to those in the Pentzien case. Thus, a unitary business finding may be warranted.

On even closer facts to those at hand, the Supreme Court of Utah held that a general construction business based in Sioux City, Iowa, was unitary in nature due to its unity of ownership, unity of operations, and unity of use. The court's holding in *Western Contracting Corp. v. State Tax Com'n*, 18 Utah 2d 23, 414 P.2d 579 (1966), was based on an uncontroverted

memorandum submitted by the plaintiff. This memorandum showed that the corporation had only one permanent home office from whence its executive, administrative, and financial affairs were directed. The president and other principal officers maintained their offices at this location. The corporation's property and equipment were also maintained at this central office.

The court summarized the other aspects of this centralized Sioux City office as follows:

> The central office hires all the permanent employees, such as project managers, project engineers, project accountants, construction superintendents, and master mechanics. These people move from project to project and are often times transferred prior to the completion of a project. The only people hired at the site of local operations are the laborers, nonsupervisory and some clerical help.

> The project payroll is prepared at the job site, where a separate set of books are maintained, but reports on these books are forwarded to the home office. From these reports, the central office applies depreciation and overhead costs, and the financial statements are prepared by the general accounting office. The banking functions are handled by the home office. The chief accountant periodically transfers money to local bank accounts from the corporation's general account to cover the local payroll checks at each project. All receipts are processed through this main office. All permanent records in connection with payrolls of each project are maintained at the central office, where quarterly payroll reports to the various governmental agencies are prepared.

> All bidding, major supply and equipment purchasing are handled by the Sioux City office. The individual project managers are summoned there regularly to review the progress on their assigned projects. All managerial functions and duties are reposed exclusively ·in the personnel at the home office, while the project managers perform, primarily, ministerial functions.

*Id.* at 33, 414 P.2d at 586-87.

Pentzien's horse farm operation is not involved in the same type of business as its pipeline company. However, the record demonstrates that payroll and employee health plans are handled by the corporate office for the horse farm as well as for the pipeline business. Managerial decisions regarding the farm are also made at the home office. The president of Pentzien reviews and approves bills from the farm and decides what kind of inventory (colts, breeding stock, etc.) to maintain. For example, the board of directors of Pentzien recently decided to shift the farm's primary emphasis from the breeding and raising of quarter horses to the thoroughbred racing horse industry.

On similar facts, the Montana Supreme Court held that a paper box business was a unitary one, so as to include the income of its instate cattle ranch operations. The case of *Russell Stover Candies v. Dept. of Revenue*, 204 Mont. 122, 665 P.2d 198 (1983), *reh'g denied* 465 U.S. 1014, 104 S. Ct. 1018, 79 L. Ed. 2d 247 (1984), held that the corporation was not entitled to separate accounting treatment. The court based its holding on the following key facts:

> The ranches depended upon the out-of-state operation for actual services including preparation of federal and state reports, tax returns and financial statements and hiring accountants to perform such services. The home office also kept all records and books and provided financing when funds in the ranch division expense account were insufficient. Further, the directors and officers controlled *all* divisions of Ward, including the ranch divisions. They approved or made *all* major decisions with respect to ranching activity such as buying equipment and buying and selling cattle. If such decisions were not made, the ranches simply would stand idle.
>
> Further, we believe that Ward [the corporation] admitted that the ranches were part of a unitary business by utilizing the unitary business approach when filing corporation income tax forms in the other states where it operated. It considered the ranches part of its unitary business to set off income earned in those states with losses incurred in Montana. However, to minimize tax assessment in Montana, Ward asserted that it was a

separate entity.

204 Mont. at _____, 665 P.2d at 201-02. In an analogous situation, Pentzien has utilized an apportionment formula in some other states.

Finally, in addressing the unitary business issue, appellant contends that because a separate system of accounting was in fact used, a unitary apportionment method of reporting to determine the corporation's income was not necessary.

In *PMD Investment Co. v. State*, 216 Neb. 553, 345 N.W.2d 815 (1984), this court held that the fact that a taxpayer uses a method of separate accounting is not binding on the State if, in fact, the taxpayer is engaged in a unitary business operation. *PMD* relied on *Exxon Corp. v. Wisconsin Dept. of Revenue*, 447 U.S. 207, 100 S. Ct. 2109, 65 L. Ed. 2d 66 (1980), which held that Exxon's use of a separate system of accounting did not preclude the State of Wisconsin from utilizing the combined or apportionment method to figure the amount of Exxon's income subject to Wisconsin's tax laws. The Court in *Exxon* stated: "As this Court has on several occasions recognized, a company's internal accounting techniques are not binding on a State for tax purposes." 447 U.S. at 221.

*PMD* additionally relied upon *Mobil Oil Corp. v. Commissioner of Taxes*, 445 U.S. 425, 100 S. Ct. 1223, 63 L. Ed. 2d 510 (1980), which noted that "separate accounting, while it purports to isolate portions of income received in various States, may fail to account for contributions to income resulting from functional integration, centralization of management, and economies of scale." 445 U.S. at 438. The *Mobil* Court continued, "Because these factors of profitability arise from the operation of the business as a whole, it becomes misleading to characterize the income of the business as having a single identifiable 'source.' " *Id*.

The overall purpose of apportionment must be remembered. It is "to permit a fair determination of the portion of business income that is attributable to business activity within the state by the reporting member of the unitary group." *PMD Investment Co. v. State, supra* at 556, 345 N.W.2d at 817. Thus, use of the property, payroll, and sales factors in Pentzien's case is appropriate.

Use of an apportionment formula which is fairly calculated to allocate to a State that portion of the net income reasonably attributable to the business done there has long been recognized as consistent with the requirements of the 14th amendment. *Butler Bros. v. McColgan*, 315 U.S. 501, 62 S. Ct. 701, 86 L. Ed. 991 (1942).

"Arbitrary and capricious action, in reference to action of an administrative agency, means action taken in disregard of facts or circumstances of the case, without some basis which would lead a reasonable and honest person to the same conclusion." *Haeffner v. State*, 220 Neb. 560, 567, 371 N.W.2d 658, 662 (1985). The finding below was not unreasonable.

In making an independent determination, it is concluded that the decision of the Board was based on appropriate evidence which justified the assessment of a tax deficiency. The Board's determination was not in violation of constitutional provisions; in excess of the statutory authority of the agency; unsupported by competent, material, and substantial evidence; or arbitrary or capricious.

The decision of the district court affirming the action of the Board is affirmed.

AFFIRMED.