[Civ. No. 24113.   First Dist., Div. Three.   Feb. 19, 1968.]

STANDARD REGISTER COMPANY, Plaintiff and Respondent, v. FRANCHISE TAX BOARD, Defendant and Appellant.

Thomas C. Lynch, Attorney General, Ernest P. Goodman, Assistant Attorney General, and E. Clement Shute, Jr., Deputy Attorney General, for Defendant and Appellant.

Paul E. Anderson, Valentine Brookes, Richard A. Wilson, Kent, Brookes & Anderson and Turner, Wells, Granzow & Spayd for Plaintiff and Respondent.

BRAY, J.*—This is an appeal by defendant from judgment, after court trial, in favor of plaintiff in the sum of $112,486.65, being refund of portions of franchise taxes for income years 1956 through 1959.

## QUESTIONS PRESENTED

1. This court is not bound by the trial court's conclusions on undisputed facts.

2. Plaintiff was conducting a single unitary operation as its Pacific division was not operated as an independent unit.

3. Applying the three-factor apportionment formula to Standard's net national income is not arbitrary.

## RECORD

For the years 1956 through 1959, defendant assessed franchise taxes against plaintiff on the theory set forth in plaintiff's tax returns that plaintiff was conducting a single unitary business, including the operation of its Pacific division. Accordingly, income from California sources was ascertained by comparing California property, payroll and sales for the entire business and applying the average of the resulting ratios to the company's total net income.

In 1961 plaintiff filed refund claims seeking an adjustment of its franchise tax for the years 1956 through 1959 by applying the tax formula to each of two separate business incomes, that is, to the Pacific division operation income separately from the income from the eastern division's operations. Defendant contended that the former of these separate computations constitutes the income of plaintiff attributable to California.

Upon the refusal of defendant to grant the requested refund, plaintiff brought this action. The trial court found that in the years in question "the Pacific Division and the Eastern Division of plaintiff did share unity of ownership but did not share unity of operations or unity of use . . . the Pacific Division was not a part of a unitary business with the Eastern Division of plaintiff. The Pacific Division was conducted as a separate and independent business . . ." That neither division contributed to nor was dependent upon the operations of the other division and that "The use of the defendant's three-factor formula to allocate the net income of the Pacific Division is more fairly calculated to determine the

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

net income derived by plaintiff from the State of California than is the use of the defendant's three-factor formula to the plaintiff's national net income." Thereupon, the court gave judgment for a partial refund of the franchise taxes paid by plaintiff for the years in question, such refund being based upon the formula applied as if the eastern and Pacific divisions were separate business operations of plaintiff.

## The Applicable Law.

Before discussing the evidence, it is well to consider the law applicable here. The California bank and corporation franchise tax is measured by income from California sources. During the years in question the basic statute relating to the method of determining the franchise tax of a taxpayer whose income is derived from sources within and without this state was section 25101 of the Revenue and Taxation Code which then provided in pertinent part: "When the income of a taxpayer subject to the tax imposed under this part is derived from or attributable to sources both within and without the State, the tax shall be measured by the net income derived from or attributable to sources within this State. Such income shall be determined by an allocation upon the basis of sales, purchases, expenses of manufacture, pay roll, value and situs of tangible property or by reference to any of these or other factors or by such other method of allocation as is fairly calculated to determine the net income derived from or attributable to sources within this State; . . ."

In interpreting this section the courts have held that if a taxpayer having business both within and without this state conducts the California business separately and distinctly from its business elsewhere, a separate accounting method for California taxes may be used but if the California business is operated unitarily with the other business, then the tax formula of section 25101 must be applied to the entire business of the taxpayer.

In *Superior Oil Co.* v. *Franchise Tax Board* (1963) 60 Cal.2d 406, 411 [34 Cal.Rptr. 545, 386 P.2d 33], the court quoted from *Butler Brothers* v. *McColgan* (1941) 17 Cal.2d 664 [111 P.2d 334], stating: " 'It is only if its business within this state is truly separate and distinct from its business without this state, so that the segregation of income may be made clearly and accurately, that the separate accounting method may properly be used. Where, however, interstate operations are carried on and that portion of the corpora-

tion's business done within the state cannot be clearly segregated from that done outside the state, the unit rule of assessment is employed as a device for allocating to the state for taxation its fair share of the taxable values of the taxpayer. . . . If there is any evidence to sustain a finding that the operations of appellant in California during the year 1935 contributed to the net income derived from its entire operations in the United States, then the entire business of appellant is so clearly unitary as to require a fair system of apportionment by the formula method in order to prevent overtaxation to the corporation or undertaxation by the state.' '' (See also *Honolulu Oil Corp.* v. *Franchise Tax Board* (1963) 60 Cal.2d 417 [34 Cal.Rptr. 552, 386 P.2d 40]; *Superior Oil Co.* v. *Franchise Tax Board* (1963) 60 Cal.2d 406 [34 Cal.Rptr. 545, 386 P.2d 33].)

The test of what is the unitary nature of a business is set forth in *Household Finance Corp.* v. *Franchise Tax Board* (1964) 230 Cal.App.2d 926, 929 [41 Cal.Rptr. 565], as follows: '' '(1) Unity of ownership; (2) Unity of operation as evidenced by central purchasing, advertising, accounting and management divisions; and (3) unity of use in its centralized executive force and general system of operation.' '' The court also stated: '' [I]f plaintiff's income is 'derived from or attributable to sources both within and without the State' (Rev. & Tax. Code, § 24301, now § 25101) 'then an allocation of total net income would naturally follow from the mandatory language of (this statute) and a separate accounting . . . could not be approved' (*Superior Oil Co.* v. *Franchise Tax Board, supra,* at p. 411). 'If the operation of the portion of the business done within the state is dependent upon or contributes to the operation of the business without the state, the operations are unitary' (*Edison California Stores, Inc.* v. *McColgan,* 30 Cal.2d 472, 481 [183 P.2d 16]) and use of an allocation formula is required (*Superior Oil Co.* v. *Franchise Tax Board, supra,* at pp. 416-417).'' (P. 929.)

### This Court's Function.

Plaintiff erroneously contends that this court's only duty is to see whether there is substantial evidence to support the trial court's findings. The correct rule, however, as the evidence in the case at bench is not conflicting, is that the determination of whether Standard's operation was a unitary one is a question of law involving the classification of uncon-

tradicted facts. Therefore, the trial court's findings are not binding on this court. Standard contends that there is a conflict in the facts which was resolved by the trial court. However, an examination of the record discloses that there is no conflict in the facts themselves, it is the conclusions to be drawn therefrom which Standard claims, in effect, are in conflict. As to these conclusions, this court is not bound by the trial court's determination. We see no difference in the situation here than in any other appellate matter where there is no conflict in the evidence. As said in *Automatic Canteen Co.* v. *State Board of Equalization* (1965) 238 Cal.App.2d 372, at page 381 [47 Cal.Rptr. 848] of its opinion, the court stated: "*Scope of Review.* Since the issues here involve the applicability of taxing statutes to uncontradicted facts,[8] we are confronted purely with a question of law and are not bound by the findings of the trial court. [Fn. 9 omitted.] [Citations.]"

In *Household Finance Corp.* v. *Franchise Tax Board, supra,* 230 Cal.App.2d 926, the trial court made specific findings of fact to the effect that the business conducted by Household in California was separate from its other business. In spite of the findings by the trial court, the Court of Appeal reversed the trial court and held that Household conducted a unitary business within and without the State of California. At page 930 of the opinion the court stated: "To the extent that the findings of fact conflict with the views we have expressed, they are either contrary to the stipulated facts or are but conclusions of law, and thus not binding on appeal." (See also *RKO Teleradio Pictures, Inc.* v. *Franchise Tax Board* (1966) 246 Cal.App.2d 812, 816 [55 Cal.Rptr. 299]; *Superior Oil Co.* v. *Franchise Tax Board, supra,* 60 Cal.2d 406, 413.)

Therefore, it is the duty of this court to examine the evidence and determine whether the trial court's conclusions therefrom are warranted, particularly Ultimate Finding No. 3, which states: "The Pacific Division did not contribute to and was not dependent upon the operations of the Eastern Division; and similarly the Eastern Division did not contribute to and was not dependent upon the Pacific Division."

## EVIDENCE

The first element in establishing that a business is a unitary

"[8]Although counsel for defendant cross-examined plaintiff's witnesses, no testimony or evidence was offered by defendant to dispute any of the facts proved by Nationwide. Notwithstanding such cross-examination, the essential facts of the case remained undisputed. [The court's footnote.]"

one, unity of ownership, is clearly present in our case. There is no question but that Standard owns both its eastern and Pacific divisions.

We will now examine the evidence to determine whether the second (unity of operation) and the third (unity of use) elements are present. At all pertinent times Standard was an Ohio corporation with its head office and principal place of business in Dayton. It was qualified to and did business in California. Its business was the manufacturing and selling of business forms, form handling equipment, and other office supplies used in conjunction with such forms. Standard manufacturing plants were located in Dayton, Ohio; York, Pennsylvania; Oakland, California; Glendale, California; and by March 1958, a manufacturing plant was also in operation in Fayetteville, Arkansas. The various plants produced a common product except that forms handling equipment was not produced on the west coast and sales books were not produced by the eastern division of the company.

The Sunset-McKee Company, a Delaware corporation, with its principal place of business in Oakland, California, was engaged in the production of business forms for many years prior to 1955. Pursuant to an agreement entered into between Standard and Sunset-McKee on May 12, 1955, Standard acquired substantially all of the assets of Sunset-McKee. The purpose of this acquisition of assets was to enable Standard to successfully expand its business into the geographic area west of the Rocky Mountains.

Shortly after Standard had acquired the assets of Sunset-McKee, Standard created a Pacific division in which the newly acquired assets were to be employed. Mr. Barrett B. Klopfer, a long time company employee, was sent to the west coast to head up the newly created division. The newly formed Pacific division employed all but two of the former employees of Sunset-McKee. Mr. Mark Smith, an employee of Standard prior to the acquisition of assets of Sunset-McKee, was made sales manager of the Pacific division.

Standard filed California franchise tax returns each year for the years here involved, which were prepared at its Dayton headquarters and computed by applying the three-factor apportionment formula of property, payroll and sales to Standard's total net income from its business operations, i.e., the tax was computed on the basis that Standard was conducting a single unitary business operation.

Commencing in February 1961, Standard filed claims for refund with respect to each of said years. The claims were based on the premise that Pacific division was to be regarded as a business operation independent of the other divisions of the corporation.

Klopfer, the Standard employee who was placed in charge of Pacific division when it was created, testified that Pacific division was in charge of its own personnel and with only a very few exceptions Sunset-McKee employees became Pacific division employees. Sunset-McKee's sales force was retained and became the Pacific division sales force. Pacific division utilized the same suppliers as had Sunset-McKee, and sold generally to the same market, i.e., the 11 western states. The purchasing department of Sunset-McKee was kept intact and became the Pacific division purchasing department. Pacific division kept intact Sunset-McKee's credit policies and handled its own credit policies, collections, and its own payrolls. It had its own sales training program and maintained its own service department. However, products were serviced from the point of use rather than the point of sale so that Pacific division also serviced eastern division sales. There was no national price list for Standard products; the Pacific division set up its own prices. It had its own employee benefit plans and maintained its own inventories and inventory control. Prior to the acquisition of Sunset-McKee's assets, Sunset-McKee purchased its forms-handling equipment from Standard. After the acquisition of Sunset-McKee's assets, Pacific division continued to purchase its forms-handling equipment from Standard's eastern division. As Pacific division did not have the productive capacity to meet the demand for its products, some of the forms sold by the Pacific division were purchased from Standard's eastern division. This, however, was not a departure from the practices of Sunset-McKee. At all times Pacific division attempted to create the image of its being a California manufacturer in order to compete in the western market which was very conscious of buying western.

Arthur M. Wittman, secretary-treasurer of Standard, was controller for Sunset-McKee, and became controller for the Pacific division, continuing in that position for three years. He testified that Pacific division basically continued Sunset-McKee. In addition to the similarities between Pacific divison and Sunset-McKee hereinbefore set forth, Pacific division maintained the same program for liability insurance, fire insurance, and many other insurance programs. Pacific divi-

sion also took over the same workmen's compensation policy with the same company which carried Sunset-McKee's workmen's compensation. Pacific division maintained its own financial department. However, money for capital improvements was budgeted by the eastern divison. Pacific division controlled the application of the budgeted capital to the various projects.

Pacific division maintained its own accounting department which kept accounting records, consisting of a general ledger, expense and subsidiary ledgers, and which prepared its own balance sheet and profit and loss statements. There were no books of Pacific division kept at the headquarters of the eastern division, Dayton. The only amount on the corporate books at Dayton reflected the investment of the eastern division in Pacific division. In 1958, however, Standard obtained a computer and on January 1, 1959, the sales accounting detail was transferred to Dayton. Dayton performed the computations, submitted the results to Pacific division, and charged Pacific division for the expense. Detailed financial statements were prepared monthly from the books of original entry maintained by Pacific division and the statements were presented to the board of directors of Standard separately from the eastern division and to Mr. K. P. Morse, the executive vice-president of Standard.

As previously noted, Pacific division established its own prices based on costs and competitive conditions existing in the market area. However, part of the business activities of Pacific division consisted in filling contracts negotiated by the eastern division, which included contracts negotiated with the federal government. When Pacific division acted as subcontractor on a government contract, it charged the same prices as had been bid by the eastern division.

Pacific division maintained its own advertising department and sales promotion department which had been taken over from Sunset-McKee. However, Pacific division utilized the advertising magazine "Paper Simplification," which was prepared by the eastern division. Pacific division sold the entire Standard product line under the Standard name.

Pacific division maintained its own mechanical engineering department; however, the eastern division had extensive product research and development facilities, the work of which was made available to Pacific division. The eastern division also made available a number of administrative services to

Pacific division which were described by Mr. Klopfer as follows: ''The administration charged to us covered the many, many services that the company participated in from a purely management and an administration standpoint. For example, they would, as an illustration, they would encounter let us say a personnel relations program designed to improve the morale of employees and so forth and so on; and they would have their own staff of psychologists for the recruitment of people, or the analyzing of people to select the right people for the right job; and we had the right to call upon them to render that service for us. When the occasion arose for that service that was always available and as a result of that arrangement we called upon them for whatever extent we wanted to, when I felt the need here existed.'' The services provided by the eastern division were reflected in the expense accounts of Pacific division.

There was in existence a system of interdivision discounts which were applicable to sales between Pacific division and the eastern division; however, these discounts were in the same range as discounts granted to or by other customers or dealers with whom Pacific division did business. In 1959 a new basis for accounting was adopted by Standard so that the manner of accounting for interdivisional sales was changed radically.

Although Pacific division maintained its own employee benefit programs, there was a company-wide bonus plan for officers, which included Mr. Klopfer.

Although Pacific division prepared California sales and use tax returns at the Oakland office, the Dayton office of Standard prepared the California franchise tax returns.

The equity financing for Standard was handled by the Dayton office, although part of the funds received were to go for the modernization of Pacific division.

The trial court found that: ''During the years in issue, the income years 1956 through 1959, inclusive, the Pacific Division continued the operations of Sunset-McKee as a business separate from the operations of the plaintiff in the states East of the Rockies. The business of plaintiff in these Eastern states was known during this period as the Eastern Division to distinguish it from the Pacific Division.''

A study of the operations of Standard and its Pacific division shows areas where Pacific acts independently of Standard. However, there are other areas wherein each of the divisions contributed to the other both in unity of use and unity

of operation, and, as said in *Edison California Stores* v. *McColgan* (1947) 30 Cal.2d 472, 481 [183 P.2d 16], concerning the enterprise there, the business done in this state "is dependent upon or contributes to" the overall operations of Standard. Of some significance is the fact that Standard, when it filed its franchise tax returns in the years 1956 through 1959, considered that it was carrying on a unitary business, particularly is this so in view of the statement in the company's annual report of 1958 that it had "integrated plants at five strategic locations in the U.S."* placing "the Company . . . in a strong competitive position. Customers in affected areas will receive the benefits of lower transportation charges and improved delivery schedules."

■ The following uncontroverted facts establish that Pacific contributed to Standard's eastern division and vice versa so that Standard's operations must be treated as unitary.

1. We start with Standard's purpose in purchasing Sunset-McKee, which became the Pacific division. The purpose admittedly was to extend Standard's operations into the Western states where Standard previously had been unable to market its products successfully.

2. The acquisition of Pacific facilitated Standard's equity financing by furnishing additional assets and more promising prospects to serve as a basis for the issuance and sale of additional stock in the corporation. A prospectus issued in 1956 pointed out that the moneys from the sale of stock would be used for improvement of buildings and equipment of the Pacific plants.

3. Pacific filled orders received at the eastern office, including government contracts bid for by the eastern office. The price charged the government was the same whether the product came from the eastern or Pacific division.

4. Pacific enabled Standard to have a complete product line, including sales books which were never manufactured in the eastern plants, although Standard also subcontracted the production of sales books to other manufacturers as well.

5. Pacific serviced products sold by the eastern group.

6. Pacific relied upon the eastern division for product research and development and for the recruitment of personnel and "the analyzing of people to select the right people for the right job."

---

*These included Pacific.

7. The operations of Pacific enabled Standard to create an image that it was a local manufacturer.

8. Forms-handling equipment sold by Pacific was manufactured only in the eastern plants. Pacific sold Standard's entire product line under the Standard name. Therefore, although Pacific conducted its own advertising, it was able to benefit from advertising material prepared by the eastern segment such as the magazine "Paper Simplification."

10. Klopfer, vice-president in charge of Pacific, brought know-how from the eastern plants and three or four times a year conferred with officers in the eastern offices with respect to problems of Pacific. On occasion he asked people from the Dayton office to come out to Pacific to make suggestions principally concerning production. Some four or five times during the period in question he asked Standard to send out a man with special skills and special training; Standard complied.

Mark Smith, an employee of Standard, was sent to Pacific to become its sales manager, and two sales and service representatives of Standard were assigned to Pacific.

11. Services of the eastern division, such as the problem-solving clinic conducted in the eastern offices were made available to Pacific's customers.

12. The budgets for capital expenditures were established through conferences with Standard's eastern officers, and a balance sheet and profit and loss statement was submitted monthly to Standard's board of directors.

13. A number of administrative services were made available by the eastern headquarters to Pacific.

14. The accounting record of Pacific showed that its total administrative expense was $1,109,226.48, of which $311,410 represented a charge for services rendered by the Eastern headquarters.

15. In 1959 a new system was devised for sales accounting, it being handled through a computer at the Dayton headquarters, and all sales expense disbursements are made from there. This resulted in a savings by Pacific of some $30,000, as it eliminated four Pacific employees. No charge was made by Dayton for the use of the computer.

16. Pacific's officers were included in Standard's bonus plan.

Although there is little direct evidence as to the cost savings or income increments realized through interdivisional

cooperation, it is obvious that such cooperation as set forth in the evidence improved Standard's overall earnings and contributed to its net income derived from its entire operations in the United States. Therefore, its business is unitary and " 'require[s] a fair system of apportionment by the formula method in order to prevent overtaxation to the corporation or undertaxation by the state.' " (See *Superior Oil Co.* v. *Franchise Tax Board, supra,* p. 411, quoting from *Butler Brothers* v. *McColgan,* 17 Cal.2d 664, 667, 668 [111 P.2d 334].)

Applicable here is the language in *RKO Teleradio Pictures, Inc.* v. *Franchise Tax Board, supra,* 246 Cal.App.2d 812, 817-818 as follows: "Respondent does not directly contend that it is not engaged in a unitary business. Rather, it takes the position that it is engaged in two separate businesses, each unitary in character, and contends that it may split its total income into two segments and apply a separate formula to each for the purpose of allocating a share of its income to California. But the effect of this argument is to say that, on facts here present, a separate accounting of income receipts, segregated as to source, is a permissible step in determining its California income. The language of Revenue and Taxation Code, section 25101 clearly states that where income of a taxpayer '. . . is derived from or attributable to sources both within and without the State . . .' the California income shall be determined by an allocation upon the basis of factors set forth in the code section. This statutory requirement is mandatory, and where, as here, the total income is derived from sources both within and without the state, separate accounting may not be employed. (*Superior Oil Co.* v. *Franchise Tax Board,* 60 Cal.2d 406 [34 Cal.Rptr. 545, 386 P.2d 33]; see also *Honolulu Oil Corp.* v. *Franchise Tax Board,* 60 Cal.2d 417, 425 [34 Cal.Rptr. 552, 386 P.2d 40]; *Household Finance Corp.* v. *Franchise Tax Board, supra,* at p. 929.)"

In *Edison California Stores* v. *McColgan, supra,* 30 Cal.2d 472, 480-481, the court stated: "[W]hen the business is not separate, and is an integral part of a larger and unitary system, the separate accounting is inadequate and unsatisfactory in ascertaining the true result of the activities and values attributable to that business. If the operation of the portion of the business done within the state is dependent upon or contributes to the operation of the business without the state,

the operations are unitary; otherwise, if there is no such dependency, the business within the state may be considered to be separate. . . .'' Within that test it is clear that Standard is doing a unitary business.

Although in many respects Pacific acted independently of Standard, it is apparent that the financing, general direction and control of Pacific was in the hands of Standard, and that Pacific was operated as a subsidiary of Standard, bringing Standard's entire operation within the provisions of section 25101 of the Revenue and Taxation Code, and requiring the application of its formula in determining the California franchise tax due from Standard.

### Application of Formula Not Arbitrary.

Standard argues that the result of applying the three-factor formula of property, payroll and sales to plaintiff's net national income is to tax extra-territorial values. The only apparent unfairness suggested by Standard would appear to be that if the three-factor formula is applied to Standard's net national income plaintiff will be subjected to a greater tax burden. Standard produces a chart which purportedly shows that the application of the three-factor formula results in arbitrary taxation of extra-territorial values. However, the figures presented are irrelevant as they stand because they do not indicate the large increase in net national income realized by respondent after the formation of Pacific. Also, Standard's approach represents an attempt to impeach the results of formula allocation through separate accounting figures. The California Supreme Court has specifically held that separate accounting figures are completely irrelevant to determining the income of a unitary business. (*Butler Bros.* v. *McColgan* (1942) 315 U.S. 501 [86 L.Ed. 991, 62 S.Ct. 701] ; *John Deere Plow Co.* v. *Franchise Tax Board* (1951) 38 Cal.2d 214, 229 [238 P.2d 569].)

The judgment is reversed.

Draper, P. J., and Salsman, J., concurred.

A petition for a rehearing was denied March 20, 1968, and respondent's petition for a hearing by the Supreme Court was denied April 17, 1968.