893 P.2d 17

STATE of Arizona, ex rel., ARIZONA DE-
PARTMENT OF REVENUE, Plaintiff–
Appellant, Cross–Appellee,

v.

TALLEY INDUSTRIES, INC., Talley Re-
alty Investment Group, Inc.; Mesa Co.,
Inc.; Talley Realty Development, Inc.;
Talley Leasing Co.; TRP Technology,
Inc., formerly known as Russell Plas-
tics; Dynamic Science; Talley Indus-
tries of Arizona, Inc.; Talley Services,
Inc.; Universal Propulsion Co.; Ado-
rence Co., Inc.; Electrodynamics; Gen-
eral Time Controls; General Time
Corp.; General Time Instruments; Mi-
nelco, Inc.; Robert Allen Classics; Sten-
cel Aero Engineering; TPV Invest-
ments; Talley Education Services; Tal-
ley International Services; Talley Sten-
cel Corp.; Talley Support Services; Tal-
ley Technical Services; Talma, Inc.; and
Waterbury Companies, Inc., Defendants–
Appellees, Cross–Appellants.

No. 1 CA–TX 92–0013.

Court of Appeals of Arizona,
Division 1, Department T.

Sept. 13, 1994.

Review Denied April 25, 1995.

Grant Woods, Atty. Gen. by Gail H. Boyd,
James M. Susa, Asst. Attys. Gen., Phoenix,
for appellant-cross-appellee.

Snell & Wilmer by Janet E. Barton, Phoe-
nix, for appellees-cross-appellants.

## OPINION

TOCI, Judge.

■ This appeal involves the Arizona in-
come of Talley Industries, Inc. ("Talley") and
its twenty-five subsidiary companies (collec-
tively, "the Talley group"). In 1983, Talley
apportioned 16.26 percent of the combined
net income of the Talley group for Arizona
state income taxation.[1] Talley contends that
the Talley group is a "unitary business" and
thus is entitled to apportion to Arizona a
share of the Talley group's overall income
from sources within and outside Arizona.
The Arizona Department of Revenue ("the
Department") argues that this Arizona ap-
portionment ratio does not accurately state
the Arizona income of the subsidiaries doing

---

1. Under "apportionment" or "formulary appor-
tionment" the measure of a tax is divided by a
formula and is based on selected factors (i.e.,
weighted percentages of in-state property, pay-
roll and sales) for attributing income to the states
involved. I Jerome R. Hellerstein and Walter
Hellerstein, *State Taxation* ¶ 8.05 (2d ed. 1993)
("Hellerstein").

business in Arizona. Consequently, according to the Department, the tax court erred in sustaining Talley's combined Arizona income tax filing.

The provisions of Ariz.Rev.Stat.Ann. ("A.R.S.") section 43–307 (Supp.1993) require every corporation subject to Arizona income tax to file a return. The issue is whether A.R.S. section 43–307 is superseded because combined reporting of overall net income by Talley and all of its subsidiaries was *necessary* under A.R.S. section 43–947 (1980) "to clearly reflect the taxable income earned by such corporation or corporations from business done in this state." In other words, can Talley properly file a single state income tax return for the tax year in question, combining all net incomes or losses of each subsidiary into a single, group-wide net income or loss figure for apportionment to Arizona?

The Department also challenges the tax court's award of attorneys' fees incurred by Talley in exhausting its administrative remedies before bringing this action. Talley cross-appeals from the tax court's decision to limit its attorneys' fees award to reimbursement at $75.00 per hour.

We hold that because no substantial interrelationship or interdependence of basic operations exists among the various subsidiaries, the fact that the Talley group is an integrated business does not justify combining all net income or losses of its subsidiaries into a single net income or loss figure for apportionment to Arizona. Consequently, the tax court erred in entering its judgment that the Talley group could properly file a single combined state income tax return for the year in question.

## I. BACKGROUND

### A. General Principles

Title 43 of the Arizona Revised Statutes Annotated is the Arizona Income Tax Act of 1978, enacted by Act of June 14, 1978, 1978

Ariz.Sess.Laws 1085, 1085–1205. *See* A.R.S. § 43–101 (1980). One of the legislature's purposes in adopting the Act was to "impose on each . . . corporation with a business situs in this state a tax measured by taxable income which is the result of activity within or derived from sources within this state." A.R.S. § 43–102(A)(5) (Supp.1993).

Arizona tax law requires the filing of a corporate tax return and imposes, for each taxable year, a tax on every corporation's entire "Arizona taxable income." A.R.S. § 43–1111 (Supp.1993). "Arizona taxable income" is defined as a corporation's federal taxable income subject to adjustments specified in A.R.S. sections 43–1121 through 43–1130 (1980 & Supp.1993). *See* A.R.S. § 43–1101 (Supp.1993). "Every corporation subject to the tax imposed by this title shall make a return to the department." A.R.S. section 43–307(A) (Supp.1993). Even if a corporation has no federal taxable income or a federal tax return is not required, a corporation must file a state return. A.R.S. § 43–307(C) (Supp.1993).

This appeal does not raise the question of whether formulary apportionment of income pursuant to A.R.S. section 43–1141 (*repealed by* Act of April 27, 1983, 1983 Ariz.Sess.Laws 1078, 1080) and Arizona Administrative Code ("A.A.C.") R15–2–1141 (repealed 1986) is applicable to this case.[2] Both parties agree that, regardless of the outcome of this case, such apportionment will be applied in determining Arizona taxable income of the Talley group companies. Rather, this appeal concerns the means by which the net income or net incomes to be apportioned are to be arrived at in the first place.

### B. The Talley Group

#### 1. Composition and Business Activities

During 1983, Talley was the parent corporation of the twenty-five wholly-owned sub-

---

**2.** For corporations whose income was derived from or attributable to sources both within and outside Arizona, A.R.S. section 43–1141 (repealed 1983) specified that the "tax shall be measured by the taxable income derived from or attributable to sources within this state." *See also* A.A.C. R15–2–1141(B)(5) (repealed 1986)

(apportionment pursuant to A.R.S. section 43–1141 (repealed 1983) may in most cases be accomplished through applying arithmetic average of ratios of values of tangible property, payroll and sales in Arizona to values of those items everywhere).

sidiaries named as co-defendants in this action. Talley's principal place of business is in Maricopa County, Arizona. Ten[3] of the subsidiaries had property, payroll, or sales in Arizona; the remaining fifteen did not. Several of the subsidiaries manufacture and supply numerous commercial and high technology products for defense and industrial uses. Others manufacture timepieces and timekeeping instrumentation, import men's and women's apparel, and buy and sell real property primarily for commercial and industrial development.

## 2. Organization

### a. Relationship Between Talley and Its Subsidiaries

Talley claims that the Tally group is a "unitary business" under the traditional definition of that term and is thus entitled to file a combined return. It relies on the following facts to support its claim that it is a "unitary business."

Talley owned 100 percent of the capital stock of the twenty-five subsidiary corporations and essentially controlled all of their operations. Talley's tax department prepared federal, state and local income tax returns for each subsidiary. It formulated the accounting, general operating, and personnel policies for all subsidiaries. Talley also borrowed funds, incurred corporate office costs, and acted as banker for its subsidiaries. Talley determined each subsidiary's salary guidelines, designated accounting manuals and methodologies, selected auditing firms, set insurance requirements, and established employee benefit and pension plans. Any claims against a subsidiary were handled by Talley under its general liability insurance policy. And, Talley's corporate officers served on each subsidiary's board of directors and supervised the operation of that subsidiary.

Other similar ties existed between Tally and its subsidiaries. Talley required that each subsidiary's checks, letterhead, purchase orders, and sales materials bear the

Talley logo, and that each subsidiary annually submit its budget to Talley for approval. Talley's Information Services Manager reviewed each subsidiary's computer needs and, as necessary, designed appropriate systems to meet them. Talley regularly conducted company-wide training programs and seminars on safety, employee benefits, supervisor training, occupational health and safety, antitrust law, products liability, and hazardous waste. It also purchased automobiles and computer equipment, negotiated contracts, and reviewed, suggested, or implemented manufacturing processes, new products, market strategies, quality control programs, and customer relations programs for the subsidiaries. And, Talley scheduled regular meetings of the subsidiary presidents for the sharing of technical and management expertise. In turn, the subsidiaries provided Talley with technical expertise and shared operational employees when necessary.

### b. Relationship Between Subsidiaries

Notwithstanding the above, the record establishes no substantial interrelationship between the subsidiaries. There were no transfers of materials, products, goods, technological data relating to products, processes, machinery, or equipment by subsidiaries operating wholly outside Arizona to subsidiaries with operations in Arizona. Also, virtually no flow of product and no vertical or horizontal integration of business operations exists between the subsidiaries with, and those without, income-producing factors and business operations in Arizona. No basic operational ties existed between the two Arizona real estate subsidiaries and any other Talley subsidiary.

## C. Results Comparison of Talley's and the Department's Filing Methods

The net federal consolidated income for the Talley group for the fiscal year ending in 1983 was $16,450,536.00. When proportional shares of Talley's net operating loss were allocated to the eight subsidiaries with Ari-

---

**3.** Talley Realty Investment Group, Inc.; Mesa Company, Inc.; Talley Realty Development, Inc.; Talley Leasing Company; TRP Technology, Inc.; Dynamic Science; Talley Industries of Arizona, Inc.; Talley Services, Inc.; Universal Propulsion Company; General Time Corporation (0.5% of sales only).

zona business operations, those subsidiaries earned a net $13,603,392.00 of the Talley group's net federal income, or 82.7 percent of the total.

The filing method advocated by the Department allocates to Arizona a company-specific share of the income of each member of the Talley group with Arizona factors. This would subject to Arizona income taxation a combined total of $10,277,406.00—or 62.2 percent of the Talley group's net federal consolidated income. The combined filing that Talley actually made for the year in question was substantially less. The combined return netted together the income and loss figures of all twenty-six members of the group and arrived at a unitary Arizona allocation share of 16.26 percent. The latter percentage was obtained by using the arithmetic average of the Talley group's ratios of property, payroll, and sales in Arizona to its property, payroll and sales everywhere. This would have subjected to Arizona income taxation a total of $2,108,322.00—or 12.8 percent of the Talley group's net federal consolidated income.

## D. Administrative Procedure and Ruling in the Tax Court

The Department examined the Talley group's federal and state income tax returns and financial records for the fiscal year ending March 31, 1983. As a result, the Department disallowed Talley's combined return and issued deficiency assessments to Talley, and to several of its subsidiaries that had operated in Arizona during that fiscal year.[4] The remaining subsidiaries were not assessed Arizona income tax because none had income-producing factors in Arizona or operational ties with any subsidiary operating in Arizona.

Talley sought administrative review by the Department. The Department's hearing offi-

cer issued a ruling upholding the assessments and disallowance of the combined return. The Department's director sustained the hearing officer's decision, finding that Talley had not met its burden of showing that the Talley group was a unitary business eligible to file a combined return.[5]

Talley appealed to Division Two of the Arizona Board of Tax Appeals ("the Board"). The Board rejected the Department's position that a business was unitary only if its activities were functionally integrated on a day-to-day operational level. Relying on *Mole–Richardson Co. v. Franchise Tax Bd.*, 220 Cal.App.3d 889, 269 Cal.Rptr. 662 (1990), the Board ruled that Talley and its subsidiaries were "an integrated business required to file under the formulary apportionment method."

Pursuant to A.R.S. section 42–124 (1991), the Department brought this action in the tax court seeking a judgment sustaining its director's final order. On cross motions for summary judgment, the tax court ruled for Talley:

[T]he Court concluded that:

(1) state statutes and the Constitution allow a state to tax that portion of corporate income attributable to sources within Arizona [A.R.S. § 43–1141(A) (repealed 1983) ];

(2) in dealing with a multi-state corporation doing business in a number of states, Arizona income is determined by "separate accounting" or "apportionment" depending on whether the taxpayer is integrated;

(3) the issue presented by these motions is whether [the Talley group] is an integrated business and the parties agree that the facts concerning that issue are not contested;

(4) a multi-state taxpayer is "integrated" when its activities within and without a state constitute inseparable parts of a sin-

---

4. The Department permitted Talley Industries of Arizona and Universal Propulsion Company to file on a combined basis. Both manufactured similar products and had significant operational ties.

5. The director's decision noted that Talley had not contested the Department's decision to combine the returns of Talley Industries of Arizona,

Inc. and Universal Propulsion Co., and stated that this combination was justified "because of their similar products and a significant product flow between them." The director's decision held that the proper method of reporting was for the remaining group members engaging in business operations in Arizona to file separate Arizona corporate income tax returns.

gle business, where the operations of the business are integrated to such a degree that its true Arizona income cannot be separately computed;

(5) taking into consideration those factors set forth in A.A.C. R15–2–1141 [ (repealed 1986) ], in the parties' pleadings, in the cases cited by the parties, and in the decision by the State Board of Tax Appeals (pages 3 and 4 of the Decision), the Court finds that defendant is an integrated business and is required to file under the apportionment method [A.R.S. § 43–1141(B)(2) (repealed 1983) ].

The tax court also held that Talley was entitled to an award of attorneys' fees pursuant to A.R.S. section 12–348(A)(2) (1992), and therefore was also entitled to fees and expenses incurred in exhausting its administrative remedies below pursuant to section 12–348(I)(1) (1992).[6]  It further held that Talley had not shown specific proof of a "special factor" or increase in the cost of living, and pursuant to A.R.S. section 12–348(E)(2) (1992) would be limited to reimbursement for attorneys' fees at $75.00 per hour.

The tax court denied the Department's motion for reconsideration.  It entered formal judgment in accordance with its rulings.  The Department appealed and Talley cross-appealed.  We have jurisdiction pursuant to A.R.S. section 12–2101(B) (1994).

## II.  ANALYSIS

### A.  Combined Corporate Income Tax Return

Arizona law deals separately with the distinct problem of determining the Arizona taxable income or incomes of related corporations.  A.R.S. section 43–942 (Supp.1993) provides:

In any case of two or more corporations owned or controlled directly or indirectly by the same interests, the department may distribute, apportion or allocate gross in-come, deductions, credits or allowances be-tween or among such taxpayers, *if it determines that such distributions, apportionment or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any such taxpayer. For the purpose of enforcing this section, the department may require the filing of a combined report and such other information as it deems necessary.*

(Emphasis added).  In addition, A.R.S. section 43–947(A) (1980) provides:

In the case of a corporation liable to report under this title owning or controlling, either directly or indirectly, another corporation or corporations and in the case of a corporation liable to report under this title and owned or controlled, either directly or indirectly, by another corporation, *the department may require a consolidated report showing the combined taxable income or other such facts as it deems necessary.  The department may, in such a manner as it may determine, assess the tax against either of the corporations whose taxable income is involved in the report upon the basis of the combined entire taxable income and such other information as it may possess or it may adjust the tax in such other manner as it shall determine to be equitable if it determines it to be necessary in order to prevent evasion of taxes or to clearly reflect the taxable income earned by such corporation or corporations from business done in this state.*

(Emphasis added).  Thus, the focus of our inquiry is whether the combined reporting of overall net income by all twenty-six members of the Talley group was necessary in order "to clearly reflect the taxable income earned by such corporation or corporations from business done in this state."

Talley's analysis substantially avoids this fundamental question.  Rather, Talley calls

---

**6.**  A.R.S. section 12–348(I)(1) provides:

"Fees and other expense" [awarded pursuant to A.R.S. section 12–348(A) ] includes the reasonable expenses of expert witnesses, the reasonable cost of any study, analysis, engineering report, test or project which is found by the court to be necessary for the preparation of the party's case and reasonable and necessary attorney fees, and in the case of an action to review an agency decision pursuant to subsection A, paragraph 2 of this section, all such fees and other expenses incurred in the contested case proceedings in which the decision was rendered.

to our attention the Department's general position (stated in A.A.C. R15–2–1141 (repealed 1986) and by its counsel in this case and others), that with few exceptions a "unitary business" is not permitted to report its Arizona-source income separately for state income tax purposes. Instead, according to Talley, a "unitary business" must use the formulary apportionment method to apportion to Arizona a share of its overall income from sources within and outside Arizona.

Additionally, Talley refers us to the Department's reliance, in unrelated litigation, on the widely and variably applied rule that a unitary business is one that "exhibits unity of ownership, functional integration and economies of scale." Talley then engages in an extended exercise of matching points of comparison between the facts of this case and those in a number of decisions from other jurisdictions that have focused on issues of "functional integration" or "unitary business" in a variety of contexts.[7] Talley states that "virtually every factor courts have traditionally and historically relied upon in determining whether functional integration exists is present here."

█ While all that may be true, this issue is a matter of first impression in Arizona. We are not bound by the decisions of California or the other states whose courts of last resort have settled this issue. We, therefore, examine the issue whether it is appropriate for us to adopt the traditional "unitary business" analysis.

It is clear from this record that the reason Talley filed a combined Arizona income tax return was to take advantage of the net operating losses of some subsidiaries that had no contact with Arizona. Talley accomplished this by offsetting these losses against net income earned by other Talley subsidiaries that would otherwise pay more Arizona

income tax. Talley based its right to file a combined return on certain Arizona statutory and regulatory provisions. These provisions, however, grant *the Department* authority to require combined returns *when necessary* for accurately determining Arizona-source income.

What we must decide is whether a combined return was actually necessary to achieve that goal here. In making that decision, we must consider if it is appropriate for us to adopt the traditional "unitary business" analysis. This is the principal test upon which Talley relies to determine whether combined returns may be required or permitted from multipartite corporate groups like Talley.

Our own decision in *Motorola, Inc. v. Arizona Department of Revenue*, 143 Ariz. 491, 694 P.2d 321 (App.1984), gives a strong indication of the proper approach for Arizona. There, the taxpayer-corporation and its subsidiaries filed a consolidated federal income tax return, while the taxpayer itself filed a separate Arizona corporate income tax return for the same period. *Id.* at 492, 694 P.2d 321. The question was how much of the combined group's federal income tax liability could the taxpayer claim as a deduction on its Arizona return.

The taxpayer in *Motorola* proposed that the necessary ratio be calculated with the taxpayer's Arizona income in the numerator, and in the denominator the sum of the total net incomes of all its related companies, including those with net losses. *Id.* at 492–93, 694 P.2d 321. The Department's formula, on the other hand, would have limited the denominator to the sum of the total incomes of all the related companies that had net gains. *Id.* Noting that Arizona statutes require that the taxpayer be allocated only an

---

7. *See Underwood Typewriter Co. v. Chamberlain*, 254 U.S. 113, 41 S.Ct. 45, 65 L.Ed. 165 (1920); *Earth Resources Co. of Alaska v. Alaska, Dep't of Revenue*, 665 P.2d 960 (Alaska 1983); *Mole–Richardson Co.*, 269 Cal.Rptr. 662; *Anaconda Co. v. Franchise Tax Bd.*, 130 Cal.App.3d 15, 181 Cal.Rptr. 640 (1982), *appeal dismissed*, 463 U.S. 1221, 103 S.Ct. 3563, 77 L.Ed.2d 1404 (1983); *Container Corp. of Am. v. Franchise Tax Bd.*, 117 Cal.App.3d 988, 173 Cal.Rptr. 121 (1981), *aff'd*, 463 U.S. 159, 103 S.Ct. 2933, 77 L.Ed.2d 545

(1983); *Chase Brass & Copper Co. v. Franchise Tax Bd.*, 10 Cal.App.3d 496, 95 Cal.Rptr. 805 (1970), *cert. denied*, 400 U.S. 961, 91 S.Ct. 365, 27 L.Ed.2d 381 (1970); *Standard Register Co. v. Franchise Tax Bd.*, 259 Cal.App.2d 125, 66 Cal. Rptr. 803 (1968); *Russell Stover Candies, Inc. v. Department of Revenue*, 204 Mont. 122, 665 P.2d 198, *appeal dismissed*, 464 U.S. 988, 104 S.Ct. 475, 78 L.Ed.2d 675 (1983); *Pentzien, Inc. v. Nebraska Dep't of Revenue*, 227 Neb. 434, 418 N.W.2d 546 (1988).

amount proportionate to the federal income taxes actually paid, we held that the Department's method was more consistent with achieving that result. *Id.* at 493, 694 P.2d 321. We stated, "If losses of the related companies were taken into account as Motorola suggests, then it would obtain the benefit of those losses despite the fact that its efforts in Arizona were profitable." *Id.* at 494, 694 P.2d 321. In *Motorola*, we did not lose sight of the principal purpose of allocation—accurately assigning to Arizona a taxpayer's fair and accurate share of income or deductions reasonably attributable to Arizona. We likewise maintain our focus on that purpose in this case.

We recognize that other courts have broadly defined the term "unitary business." According to a respected authority on state taxation:

> The cases are replete with varying attempts by the courts to define "unitary business" for formulary apportionment purposes. Perhaps the most frequently repeated definition is that of the California Supreme Court:
>
> > If the operation of the portion of the business done within the state is dependent upon or contributes to the operation of the business without the state, the operations are unitary.
>
> A more particular statement of the test is that a business is unitary if these circumstances are present: "(1) Unity of ownership; (2) Unity of operation as evidenced by central purchasing, advertising, accounting and management divisions; and (3) Unity of use of its centralized executive force and general system of operation."

Hellerstein, *supra*, ¶ 8.11[1] (footnotes omitted).

The California three-unities test for "unitary business" is at one end of a continuum of alternative formulae, *see id.* ¶ 8.11[3], the narrowest of which is exemplified by Louisiana and Mississippi. *See id.* ¶ 8.11[2]. In an example of a narrow test for unitary business, the Louisiana Supreme Court, in *Texas Co. v. Cooper*, 236 La. 380, 107 So.2d 676 (1958), held that an oil company that produced, refined, and sold oil products across a number of states was not unitary, and, accordingly, was required to report its instate production income to Louisiana on a separate accounting basis. Hellerstein criticizes the *Texas Co.* approach as overly "restrictive." We agree.

We similarly agree with a number of Hellerstein's criticisms of the prevailing California "three-unities" approach. Hellerstein states that "[s]uch generalizations ... offer little practical guidance in deciding unitary business controversies." I Hellerstein, *supra*, ¶¶ 8.11[1]. According to the treatise, the "three-unities" approach has been used both by courts who have applied the test in a highly restrictive manner and by others who have applied it very broadly. *Id.* In those states that apply the "unitary business" test broadly, there is "an extensive, time consuming, and burdensome (to the taxpayer at least) detailed examination of virtually every aspect of the interrelations of the various constituents of the enterprise." *Id.* ¶ 8.11[5] (footnote omitted). This has been compared to a " 'psychoanalysis of the business.' " *Id.* The tax administrator then makes a subjective judgment about "whether the requisite centralized control, management, and unity of operation exists (centralized ownership is usually a simple matter to establish or disprove)." *Id.* Hellerstein asserts that because of the magnitude and complexity of the record produced by this extensive inquiry, on review judges are reluctant to set aside the assessment. *Id.*

As a rational compromise between the broad California three-unities test and the unduly restrictive approach at the other end of the spectrum, Hellerstein advocates the "intermediate approach" adopted by such cases as *Pennsylvania v. ACF Industries, Inc.*, 441 Pa. 129, 271 A.2d 273 (1970). *See* I Hellerstein, *supra*, ¶ 8.11[4]. In that case, ACF was a New Jersey corporation headquartered in New York City and registered to do business in Pennsylvania. *ACF Indus.*, 271 A.2d at 274. In Pennsylvania, ACF manufactured railroad and tank cars, repaired freight and tank cars, manufactured pressed steel and pressure vessels, and sold some products made outside Pennsylvania. *Id.* It also carried on these same activities, togeth-

er with certain aerospace and nuclear engineering operations, outside of Pennsylvania. *Id.*

ACF bought a large block of stock in an aviation corporation to explore acquisition or merger possibilities. *Id.* Sixteen months later, it sold all these shares at a $5 million capital gain. *Id.*, 271 A.2d at 275. ACF excluded all of this gain when reporting its corporate net income to Pennsylvania for the year of the sale on the theory that this income was derived from an asset unrelated to its Pennsylvania activities. *Id.* The trial court disagreed, finding that the sale of stock was part of ACF's unitary operation and therefore the gain was includable in its Pennsylvania net income. *Id.*

The Pennsylvania Supreme Court reversed, stating that "it is virtually impossible to envision a successful multiform [i.e., nonunitary] claim based upon a separation of vertical functions of a corporation where the selling function deals in the products of the manufacturing and/or wholesaling functions." *Id.*, 271 A.2d at 279. The court went on to observe "that performance by the corporate whole of policy, administrative, research and similar functions for otherwise independently operating units does not vitiate multiformity any more than does their common but independent contribution of benefits to the corporate whole." *Id.* The court then stated that in allocating to Pennsylvania its fair share of income "reflective of activity here" and in excluding income not derived from Pennsylvania activities, the following principles are applicable:

First, if a multistate business enterprise is conducted in a way that one, some or all of the business operations outside Pennsylvania are independent of and do not contribute to the business operations within this state, the factors attributable to the outside activity may be excluded.

Second, in applying the foregoing principle to a particular case, we must focus upon the relationship between the Pennsylvania activity and the outside one, not the common relationships between these and the central corporate structure. Only if the impact of the latter on the operating units or activities is so pervasive as to negate any claim that they function independently from each other do we deny exclusion in this context.

Third, without attempting to preclude exclusion in any given case, we reiterate our statement above that the manufacturing, wholesaling and retailing (or manufacturing and selling) activities of a single enterprise are not fit subjects for division and partial exclusion. On the other hand, a truly divisionalized business, conducting disparate activities with each division internally integrated with respect to manufacturing and selling, may well be in a position to make a valid claim for exclusion.

*Id.*, 271 A.2d at 279–80; *see also Cox Cablevision Corp. v. Department of Revenue*, 12 Or.Tax 219, 1992 WL 132428 (Or.Tax Ct.1992).

Hellerstein persuasively characterizes the features and advantages of this intermediate approach. The treatise states: "The recognition that an enterprise is not unitary unless, inter alia, there is a substantial interdependence of basic operations among the various affiliates or branches of the business provides a quantifiable, objective test of the unitary business." I Hellerstein, *supra*, ¶ 8.11[5], at 8–92. The writers further state:

Minor or insubstantial transactions or interrelations between segments of a business ought not suffice for treatment as a unitary business. *Inherent in the concept that a business is sufficiently integrated and interdependent to warrant apportionment by a formula that is applied to the entire tax base of the multi-state or multinational enterprise is the assumption that the interrelations and interdependence are substantial....* Substantiality is subsumed in many cases by the court's detailing the extent of interdependent operations taking place in the various states. In point of fact, in most of the cases in which the businesses have been found unitary, interdependence of the basic operations has been substantial, by any reasonable measure of substantiality.

*Id.* ¶ 8.11[4][c], at 8–90 to 8–91 (emphasis added) (footnote omitted).

In drawing the line between basic operations that make a business unitary and those

that do not, we take note of the considerations that gave rise to the unitary business doctrine in the first place. The doctrine was originally derived from the unit rule as it developed in the nineteenth century with respect to enterprises such as railroads and telegraph companies. *Id.* ¶ 8.11[4][b]. These organizations were horizontally integrated; typically, a segment of the railroad was operated in each of several states. *Id.* The unitary business doctrine was also applied to manufacturing, producing, and mercantile companies doing business across state lines. The latter organizations normally involve vertically integrated businesses. Both vertically and horizontally integrated organizations are generally held to be unitary, "because of the inability to determine, under any practicable separate accounting method, the amount of income properly attributable to the various stages of the enterprise conducted in particular States." *Id.*

Thus, under the formulary method of apportionment applicable to unitary businesses, no need exists "to determine a fair arm's-length price for goods transferred to a branch or affiliate, as must be done in a separate accounting." *Id.* The problem with separate accounting in a unitary business is the "inability to establish fair arms's-length prices for goods transferred, or basic operational services rendered, between controlled branches or subsidiaries of an enterprise." *Id.* ¶ 8.10[1][a].

The unitary business rule, then, essentially rests on the difficulty of determining the amount of income attributable to various stages of producing, refining, manufacturing, transporting, buying, selling, and the like, conducted in different states. This consideration does not exist, at least to the same extent, to centralized management or control, financing, research, legal, accounting, or other internal services rendered by one branch or affiliate to another. *Id.* ¶ 8.11[4][b]. Such services are not contained in the product or its delivery to the customer and may be considered as an accessory to the operations of the business. *Id.* Furthermore, "unlike the elusive efforts to determine the proper cost to be attributed to articles produced or manufactured by one branch or affiliate and sold to another," management costs and oth-

er services can be charged to the various operations by using generally accepted accounting methods. *Id.* The result is that the same state tax avoidance opportunities afforded by intercompany transfer pricing, which are inherent in transfers of materials, products, or goods between branches or affiliates, are not present in attributing to various states management costs and the costs of other types of internal services and facilities. *Id.*

As we previously observed, the fundamental question on appeal is whether combined reporting of overall net income by the Talley group was necessary to clearly reflect the taxable income earned by those subsidiaries with Arizona income factors. *See* A.R.S. § 43–947. Both *ACF Industries* and Hellerstein convince us that the "three-unities" test advocated by the Talley group has little relation to that fundamental inquiry. We conclude that the practical difficulty of determining the amount of income properly attributable to an interstate horizontal enterprise or to distinct manufacturing, production, or merchandising stages of a vertical enterprise does not exist in this case. Although Talley correctly states that it provides centralized management and control, financing, research, legal, accounting, and other internal services to its subsidiaries, such services are capable of measurement. And, for the most part, the services are not embodied in the product or its delivery to the customers of Talley. Thus, they are not "so pervasive as to negate function[al] independ[ence]" of the subsidiaries. *ACF Indus.*, 271 A.2d at 279. Furthermore, the costs of these services can be charged to the various subsidiaries—and in fact were charged to such subsidiaries—under established accounting methods. *See* I Hellerstein, *supra*, ¶ 8.11[4][b].

What might well give rise to the problem of practical inability to apportion income to individual states would be the existence of substantial transactions, interrelations or interdependence of basic operations among the various income-earning subsidiaries. Here, however, Talley has not disputed the proposition that there are "virtually no operational ties among the subsidiaries."

Talley relies instead on the proposition that "functional integration at the operational level simply requires integration by and be-

tween the parent and each subsidiary so that the subsidiaries exhibit the same general system of operation," citing *Earth Resources, Mole–Richardson,*[8] *Russell Stover,* and *Pentzien.* These cases, however, have been criticized as based on the over broad three-unities test, or as presenting "too sweeping a view of a unitary business," and in any event in conflict with the basic operational interdependence test. *See* I Hellerstein, *supra,* ¶ 8.15. As to the *Russell Stover* and *Earth Resources* decisions, Hellerstein concludes that "[t]here is no justification for unitary apportionment in such circumstances." I Hellerstein, *supra,* ¶ 8.15, at 8–177.[9] We agree with Hellerstein, and hold that the same is true in the circumstances revealed by this record.

### B. Attorneys' Fees—Appeal and Cross–Appeal

Because we hold that the tax court erred in granting summary judgment for Talley, we need not address the Department's contention that the tax court erred in awarding Talley its attorneys' fees. Similarly, we need not decide whether the tax court erred in computing Talley's award of attorneys' fees at the rate of $75.00 per hour.

### III. CONCLUSION

For the foregoing reasons, we reverse and remand with directions to enter judgment in favor of the Department.

GRANT, P.J., and KLEINSCHMIDT, J., concur.

---

8. The California Court of Appeal's decision in *Mole–Richardson Co.* formed the basis for the Board of Tax Appeals' decision in the instant case.

9. *See also* I Hellerstein, *supra,* ¶ 8.11[3][b], at S8–5 (Supp.1993) (criticizing as overly broad the decision of the Arizona Board of Tax Appeals in *Piccadilly Cafeterias, Inc. v. Arizona Dep't of Revenue,* No. 820–91–I, 1992 WL 249055 (Ariz.Bd. of Tax Appeals, Sept. 1, 1992)). Hellerstein states:

This holding is open to some question. There are apparently no transactions between any of

the cafeterias. Purchases of perishable food-stuffs are made locally. Although certain food items are bought under national contracts, each cafeteria manager decides where and the extent to which he orders them. Likewise, local managers procure, maintain, and repair equipment. These facts appear to fall short of interdependence of basic operations between the cafeterias. To be sure, there is a set of standard policies and rules established that cafeteria managers must follow, but that does not constitute basic operational interdependence.